## EDWARD L. RICE *vs.* JOHN FOSTER.

*Law* is a rule of conduct *prescribed* by *legislative power* for the government of the citizens of a State.

*Legislative power* in this State is *vested* in a *General Assembly*, consisting of a Senate and House of Representatives.

The people have *divested* themselves of all legislative power, and *vested* it in this body. They can resume it only in the forms of the constitution, or by revolution.

The General Assembly cannot delegate this power to any other person, or body ; not even to the people at large; nor can they make it to depend on the assent or approval of any other.

The citizen is bound to obey the *will* of the legislature, as *prescribed* in the written statute. If the statute in itself give no evidence of *legislative will*, as a rule of conduct, the citizen cannot obey it; if it subject the legislative will to any other will, the citizen is not bound to obey it.

The act of 1847 "authorizing the people to decide by ballot whether the license to retail intoxicating liquors shall be permitted among them," expresses no *legislative will* on this question; *prescribes* no *rule of conduct* for the government of the citizen; and *delegates legislative power* to the people of each county.

DEBT on a lease. Case stated. The legislature of Delaware by act of the 19th of February, 1847, entitled " An act authorizing the people to decide by ballot, whether the license to retail intoxicating liquors shall be permitted among them," enacted as follows :—

Sec. 1. That on the first Tuesday in April, 1847, the citizens of the several counties in this State, shall decide by their votes whether or not the retailing of intoxicating liquors shall be permitted in said counties.

Sec. 2. The officers of the last general election shall, on that day, open a poll at the several election districts, and receive the ballots of qualified voters for " license" or " no license;" and an accurate return of the votes shall be made to the clerk of the Court of General Sessions, to be laid before the judges.

Sec. 3. If at such elections there shall be a majority of votes for " no license" in any or all of the said counties, it shall not at any time thereafter be lawful for any person to retail intoxicating liquors within such county; and it shall not be lawful for the said court to recommend for license any person to keep a tavern or store for the sale of intoxicating liquors within said county; and the retailing intoxicating liquors within the county so voting is declared to be a *nuisance,* and is prohibited, until such decision of the majority of votes shall have been reversed as hereinafter provided.

Sec. 4. If any county, by a majority of votes, shall decide against

retailing intoxicating liquors, it shall be the duty of the judges of the said court in said county, to license " temperance houses" for public accommodation without authority to retail intoxicating liquors, on the same terms and conditions that taverns are now licensed, except for such licenses shall be charged but one-half the sum now charged for licenses for the sale of liquors; and also, upon the recommendation of twelve citizens, to license a sufficient number of store keepers, &c., to sell spirituous liquors, &c., for medicinal and sacramental purposes, and to be used in the arts; the persons so licensed to be sworn, and to give bond as herein provided.

Sec. 5. On application of one-fourth of the legal voters to the Levy. Court, to present the question of " license" or " no license" again to the electors, another election shall be held for the same purpose, and in the same manner, on the first Tuesday in April next succeeding.

Sec. 6. If there shall be a majority of votes for " no license " in any county, it shall be an indictable misdemeanor for any person to sell liquor in such county contrary to this act.

Sec. 7. If at any such election there shall be a majority of votes for " license," then the laws now in force regulating the licensing of taverns, &c., shall remain and be in full force as before, so far as respects such county or counties which shall so determine. (10th v. 178.)

In pursuance of this act, elections were held in April, 1847; and certain paper writings purporting to be the returns of said élections were filed in the court, showing a majority of votes in New Castle county *against* license.

The present action was brought for the purpose of trying the constitutionality of this act of assembly. It was an action of debt on a lease, from Rice to Foster, of a tavern house in Wilmington, at a rent of $700 per annum; subject to a proviso that the rent should be only $500 ; " if by the law of this State, the Court of General Sessions have not at the May term, 1847, any lawful authority to recommend to the governor, any person to keep a public house or tavern for the sale of intoxicating liquors within the county of New Castle." One quarter's rent was due and payable, by the terms of the lease, on the 8th of May, 1847 : the defendant paid $125, and refused to pay any more; and this suit was brought for the residue.

The questions arising on the record were submitted to the Superior Court; and were reserved, by order of that court, for hearing before all the judges. The case came up for hearing in the Court of Appeals, consisting of *Johns*, Jr., Chancellor; *Booth*, Chief Justice, and

Judges *Harrington, Milligan* and *Hazzard,* at the June term, 1847; and was argued mainly on the constitutional question, (though objection was also taken to the validity and sufficiency of the election returns,) by *J. A. Bayard, Wales* and *Clayton,* for the plaintiff; and by *Smithers, Bradford* and *Layton,* for the defendant.

The plaintiff's counsel made the following points: 1st. That no authentic evidence of the election, and its result, had been presented to the court. 2d. That the act of 1847 was unconstitutional, because it was contrary to the limitations of legislative power necessarily involved in a representative republican form of government.

The people cannot make a law; neither the whole people nor a part of them. All laws must be made by their representatives in general assembly met for deliberation, consultation and judgment; acting under oath, and under the restrictions of the constitution.

The representatives of the people in the legislature, though, in general, bound to respect the will of their constituents, are also bound to exercise their own judgment, and to oppose that will, when it invades individual rights, or violates the principles of the social compact. This is a right of minorities, which it was the object of the constitution to secure.

The general assembly is the depository of legislative power; which is a trust to be executed with judgment and discretion, and cannot be delegated to any other body, or persons.

The act of 1847 delegates legislative power to a majority of the people of a county. The restriction upon the granting of licenses is not imposed by the act itself, but by a vote of the people. It may be repealed, and again revived, without any further action of the legislature, or any expression of legislative will. If it be constitutional thus to legislate on this subject, it is so on all others; and legislative power is thus virtually transferred from the general assembly, where the constitution has placed it, to a portion of the citizens; though it does not exist even in all the citizens.

Legislative power exists as a unit, to be applied to all the people alike who are under the same sovereignty; and a law applicable to a general offence, cannot be limited to a part only. The same crime, or offence, cannot be punished differently in the different counties.

The act in question is unconstitutional as a revenue bill; and, also, as conflicting with the clause that requires all elections to be free and equal; because it seeks to bind all the people by the vote of a majority of the people of one county only.

The constitution in no case authorizes an election for any other purpose than the choice of agents, who, as depositories of the sovereign power in its several branches, are to administer the government; and the legislature has no authority to call the elective franchise into action for any purpose not designated by the constitution.

Original and ultimate sovereignty is in the people; yet it is never exercised by them collectively, but only through agents of their selection. The purpose of elections is to choose such agents.

The defendant's counsel argued: 1st. That the election returns, though informal, were sufficient. 2d. That the act of 1847 was constitutional.

It does not delegate legislative power. Legislative power is the power of making laws; not merely voting for or against laws made by others, but of proposing and maturing laws. The legislature passed this law. They expressed the judgment that such a law was beneficial to the community; and they declared the legislative will that such a law should exist, *if* a certain number, to wit, a majority of the people of either county, should vote in a certain way.

A strong argument in favor of the law is furnished by the practice of similar legislation in the General Government, and of the several States.

The Constitution of the United States was itself subjected by the federal convention to the sanction of Congress, and of the States. The same may be said of most of the State constitutions, which were submitted to a vote of the people.

The ordinance of 1787, for the government of the N. W. Territory, which was subject to the laws of Congress, authorized the governor and judges to report laws which should be in force unless disapproved of by Congress; and this kind of legislation was sustained by the courts. (3 *U. S. L.* 2074; 5 *Wend.* 478; 7 *Ibid* 539.)

The acts authorizing the President to give notice in respect to the joint occupation of Oregon, and for the admission of Texas, on a vote of the people, are of the same character.

The acts of 1809, 1810, repealed the non-intercourse laws on a subsequent event, to be made known by the President's proclamation; and this conditional mode of legislation was sustained by the Supreme Court, in the case of The Aurora *vs.* The United States, 7 *Cranch* 382; 3 *St. Pa.* 297. The act now in question is on the same principle

Under the Constitution of the United States no new State can be formed by dividing a State without the consent of its legislature; yet the State of Maine was formed of Massachusetts territory on a law

of that State submitting the question to the people of Maine. The constitution of Maine is not unconstitutional. ⌐(*Const. U. S., Art.* 4; 4 *U. S. L.* 211, *ch.* 195; 2 *Mass. L.* 504.)

Similar laws have been passed in other States, and in our own. (13 *Conn. Rep.* 120; *Laws Kenty.* 1842; 4 *B. & Mun. Rep.* 146-49; *M. & Per. Dig.* 566; 24 *Pick.* 359; 12 *Ibid* 184; 7 *Cow.* 349, 585; 2 *Overton* 171; 2 *Yeates* 493; 2 *Marshall* 483; *Laws Mich.* 1845, *ch.* 46; *Laws Vermt.* 1846, *ch.* 24; *Laws. Ohio* 1847, *p.* 131, *Laws of N. York* 1845, *p.* 322; *Laws of Penna.* 1846, *p.* 348; *Laws of N. Car.* 49, *ch.* 36; *Laws of Del.* 8 *vol.* 21, 24; 3 *Harr. Rep.* 335; *Dig.* 493; 3 *Kent Com.* 278; 13 *Wend.* 355; 9 *Del. Laws* 284, 527.)

The act for the establishment of free schools, sec. 5; and the supplement to the Wilmington city charter; and also the act for the removal of the seat of justice from New Castle; and the act authorizing school district No. 18, Kent county, to lay taxes by vote, are all on the same principle. So, also, the laws authorizing the Levy Court to lay taxes, to accept roads, &c., &c.

The law of 1847, is not objectionable on either of the other grounds mentioned.

Examples of legislation for a single county or district are frequent, and often requisite to meet the condition of such county or district. This is peculiarly so as to nuisances; and the sale of liquor is declared in this act to be a nuisance.

The provision for the freedom and equality of elections has no reference to, or bearing on this question; and there is nothing in the constitution to prevent a ballot on an abstract question, as well as on the election of officers.

This is not a revenue bill; but a mere police arrangement to restrain the sale of liquor. The revenue raised by it is merely incidental.

The plaintiff's counsel replied, that the framing of constitutions or organic laws, where no constitution existed before, was a different thing from passing laws under constitutions which vest legislative power in a particular branch; and that the instances of irregular legislation in other States were of no authority, unless they had been sustained by judicial investigation.

That the argument of the defendants gave to the people at least a veto on the acts of the legislature, which was unconstitutional.

That the legislature had no more power to make their action to depend on the will of the people, than either of the other branches of government; the judiciary, for instance, or the executive.

That such a mode of legislation was dangerous, and a virtual surrender of the power.

And, they maintained, that there was a distinction between this act and the free school law, and other laws with which it had been compared; except the act for removing the seat of justice from New Castle, which was admitted to be liable to the same objection.

The opinion of the Court was delivered by the Chief Justice, who was followed by Judge Harrington, and the Chancellor; the former of whom, with Judge Hazzard, dissented on the first point, viz: the sufficiency of the election returns. On the Constitutional question, the Court were unanimous.

BOOTH, *Chief Justice.*—The question arising upon the statement of facts in the case submitted to the court, is, whether the judges of the Court of General Sessions of the Peace and Gaol Delivery have any lawful authority to recommend to the governor of the State, any person or persons to keep an inn, tavern, or public house of entertainment, for the sale of intoxicating liquors, within the county of New Castle.

At a very early period in the history of our colonial government, licenses to keep inns, taverns, and public houses of entertainment, were granted by the governor, upon the recommendation of the judges of the Court of General Sessions of the Peace and Gaol Delivery. Spirituous and vinous liquors were retailed by virtue of this license, although not mentioned in its words. With a few slight modifications, the law on this subject has continued in force to the present time. The legislature of this State at their late session, passed an act on the nineteenth day of February last, authorizing the people in their several counties, on the first Tuesday of April, A. D. 1847, to decide by ballot, whether the retailing of intoxicating liquors should be permitted among them. If a majority of votes polled in any county at such election was for " no license," by the terms of the act, the retailing of intoxicating liquors is prohibited within such county; and the judges of the Court of General Sessions of the Peace and Gaol Delivery have no lawful authority to recommend any person for a license to keep an inn, tavern, or public house of entertainment. If a majority of votes was for " license," the law continues in force, and licenses are to be granted as heretofore.

The question then depends on the validity of the act of the nineteenth of February, 1847; and if valid, on the result of the popular vote in New Castle county, at the election held on the first Tuesday of April last.

Admitting, for the sake of the argument, (but it is denied by a majority of this court,) that the alledged returns are properly authenticated, and afford sufficient legal evidence that a majority of the votes in New Castle county was against licensing the retailing of intoxicating liquors; then the important question which has been argued in this cause arises: whether the act of the nineteenth of February, is unconstitutional.

The proposition that an act of the legislature is not unconstitutional unless it contravenes some express provision of the constitution is, in the opinion of this court, untenable. The nature and spirit of our republican form of government; the purpose for which the constitution was formed, which is to protect life, liberty, reputation and property, and the right of all men to attain objects suitable to their condition without injury by one to another; to secure the impartial administration of justice; and generally, the peace, safety and happiness of society, have established limits to the exercise of legislative power, beyond which it cannot constitutionally pass. An act of the legislature directly repugnant to the nature and spirit of our form of government, or destructive of any of the great ends of the constitution, is contrary to its true intent and meaning; and can have no more obligatory force, than when it opposes some express prohibition contained in that instrument. It is irrational to maintain, that such an act is a law, when it defeats the very object and intention of granting legislative power. Therefore an act, such as that mentioned in the argument, to make a man a judge in his own cause, would not be valid; because it never was the intention of the constitution to vest such power in the legislature, the exercise of which violates the plainest principles of natural justice. So also an act is void, if it palpably violates the principles and spirit of the constitution, or tends to subvert our republican form of government. Of this character, it is contended, is the act of the legislature of the nineteenth of February, 1847.

The powers of government in the United States are derived from the people, who are the origin and source of sovereign authority. The framers of the Constitution of the United States, and of the first constitution of this State, were men of wisdom, experience, disinterested patriotism, and versed in the science of government. They had been taught by the lessons of history, that equal and indeed greater dangers resulted from a pure democracy, than from an absolute monarchy. Each leads to despotism. Wherever the power of making laws, which is the supreme power in a State, has been

exercised directly by the people under any system of polity, and not by representation, civil liberty has been overthrown. Popular rights and universal suffrage, the favorite theme of every demagogue, afford, without constitutional control or a restraining power, no security to the rights of individuals, or to the permanent peace and safety of society. In every government founded on popular will, the people, although intending to do right, are the subject of impulse and passion; and have been betrayed into acts of folly, rashness and enormity, by the flattery, deception, and influence of demagogues. A triumphant majority oppresses the minority; each contending faction, when it obtains the supremacy, tramples on the rights of the weaker: the great aim and objects of civil government are prostrated amidst tumult, violence and anarchy; and those pretended patriots, abounding in all ages, who commence their political career as the disinterested friends of the people, terminate it by becoming their tyrants and oppressors. History attests the fact, that excesses of deeper atrocity have been committed by a vindictive dominant party, acting in the name of the people, than by any single despot. In modern times, the scenes of bloodshed and horror enacted by the democracy of revolutionary France, in the days of her short-lived, misnamed republic, shocked the friends of rational liberty throughout the civilized world. There, in the midst of the most refined and polished nation of Europe, the guillotine dispensed with the forms of law as unmeaning pageants; and under the capricious mandates of popular frenzy, running wild in pursuit of the phantom of a false, licentious liberty, " suspicion filled their prisons, and massacre was their gaol delivery."

In the convention of 1787, which formed the Constitution of the United States, the spirit of insubordination, and the tendency to a democracy in many parts of our country, were viewed as unfavorable auguries in regard both to the adoption of the constitution, and its perpetuity. The members most tenacious of republicanism, were as loud as any in declaiming against the vices of democracy. Mr. Gerry, of Massachusetts, the friend and associate of Mr. Jefferson, thought it " the worst of all political evils." The necessity of guarding against its tendencies, in order to attain stability and permanency in our government, was acknowledged by all. Even the propriety of electing by an immediate vote of the people, the first branch of the national legislature, was seriously questioned by some of the ablest members, and warmest advocates of a republican form of government. Mr. Sherman, of Connecticut, opposed it on the ground

that the people were constantly liable to be misled; and he insisted that the election ought to be by the State legislatures. Mr. Gerry remarked, that " he did not like the election by the people." He said, " the evils we experience, flow from the excess of democracy; the people do not want virtue, but are the dupes of pretended patriots." Mr. Madison, although he considered " the popular election of one branch of the national legislature, as essential to every plan of free government, was an advocate for the policy of refining the popular appointments by successive filtrations." Mr. Edmund Randolph, of Virginia, observed, " that the object was to provide a cure for the evils under which the United States labored; that in tracing these evils to their origin, every man found it in the turbulence and follies of democracy; that some check, therefore, was to be sought for, against this tendency of our governments; and that a good Senate seemed most likely to answer the purpose." In the debates on the federal constitution in the Virginia convention, Mr. Madison, always the advocate of popular rights, subject to the wholesome restraints of law, remarked, " that turbulence, violence, and abuse of power, by the majority trampling on the rights of the minority, have produced factions and commotions; and that these in republics, more frequently than any other cause, have produced despotism." " If," he observes, " we go over the whole history of ancient and modern republics, we shall find their destruction to have generally resulted from those causes. If we consider the peculiar situation of the United States, and go to the sources of that diversity of sentiment which pervades its inhabitants, we shall find great danger to fear that the same causes may terminate here, in the same fatal effects which they produced in those republics." To guard against these dangers and the evil tendencies of a democracy, our republican government was instituted by the consent of the people. The characteristic which distinguishes it from the miscalled republics of ancient and modern times, is, that none of the powers of sove reignty are exercised by the people; but all of them by separate, co-ordinate branches of government in whom those powers are vested by the constitution. These co-ordinate branches are intended to operate as balances, checks and restraints, not only upon each other, but upon the people themselves; to guard them against their own rashness, precipitancy, and misguided zeal; and to protect the minority against the injustice of the majority.

The Constitution of the State of Delaware begins by asserting the great principles on which it is founded; and the aim and object of

establishing our form of government. The first article contains a declaration of those inherent rights which belong to every individual in society; of certain restrictions imposed on the legislative, executive, and judicial power; and of the right of the citizens to meet together in an orderly manner, and to apply to persons entrusted with the powers of goverment, for redress of grievances, or other proper purposes, by petition, remonstrance, and address. Most of the matters mentioned in the first article, are merely declaratory of the doctrines of the common law on the same subjects, formerly affirmed by magna charta, in the year 1215, and afterwards asserted by the bill of rights, in 1688, as the undoubted rights and liberties of the people of that country, whence we have derived our language and literature; the christian religion and the common law. The same article of our constitution concludes with a declaration in the name of the people, that every thing contained in that article is reserved by them, out of the general powers of government thereinafter granted. All powers therefore, not reserved, are surrendered by the people to those entrusted with the powers of government, to be exercised only in accordance with the principles and design of the constitution, and the genius of our republican system. The legislative, executive, and judicial powers, compose the sovereign power of a State. The people of the State of Delaware, have vested the legislative power in a General Assembly, consisting of a Senate and House of Representatives; the supreme executive powers of the State in a Governor; and the judicial power in the several Courts mentioned in the sixth article. The sovereign power therefore, of this State, resides with the legislative, executive, and judicial departments. Having thus transferred the sovereign power, the people cannot resume or exercise any portion of it. To do so, would be an infraction of the constitution, and a dissolution of the government. Nor can they interfere with the exercise of any part of the sovereign power, except by petition, remonstrance, or address. They have the power to change or alter the constitution; but this can be done only in the mode prescribed by the instrument itself. The attempt to do so in any other mode is revolutionary. And although the people have the power, in conformity with its provisions, to alter the constitution; under no circumstances can they, so long as the Constitution of the United States remains the paramount law of the land, establish a democracy, or any other than a republican form of government. It is equally clear, that neither the legislative, executive, nor judicial departments, separately, nor

all combined, can devolve on the people, the exercise of any part of the sovereign power with which each is invested. The assumption of a power to do so, would be usurpation. The department arrogating it, would elevate itself above the constitution; overturn the foundation on which its own authority rests; demolish the whole frame and texture of our republican form of government, and prostrate every thing to the worst species of tyranny and despotism, the ever varying will of an irresponsible multitude. The powers of government are trusts of the highest importance; on the faithful and proper exercise of which, depend the welfare and happiness of society. These trusts must be exercised in strict conformity with the spirit and intention of the constitution, by those with whom they are deposited; and in no case whatever can they be transferred or delegated to any other body or persons; not even to the whole people of the State; and still less to the people of a county. It is a plain proposition of law, that a power, or authority, vested in one or more persons to act for others, involving in its exercise judgment and discretion, is a trust and confidence reposed in the party, which cannot be transferred or delegated. The making of laws is the highest act of sovereignty that can be performed in a free nation; and, therefore, the legislative power may be truly said to be the supreme power of a State. Its exercise requires superior intellectual faculties, improved by study and experience; although it seems to be a common notion with many pretended advocates of popular rights at the present day, that every man is instinctively fitted to be a member of the legislature. If the legislative functions can be transferred or delegated to the people, so can the executive or judicial power. The absurd spectacle of a governor referring it to a popular vote, whether a criminal, convicted of a capital offence, should be pardoned or executed, would be the subject of universal ridicule: and were a court of justice, instead of deciding a case themselves, to direct the prothonotary to enter judgment for the plaintiff, or defendant, according to the popular vote of a county, the community would be disgusted with the folly, injustice, and iniquity of the proceeding. All will admit, that, in such cases, the people are totally incompetent to decide correctly. Equally incompetent are they to exercise with discernment and discretion, collectively, or by means of the ballotbox, the power of legislation; because, under such circumstances, passion and prejudice incapacitate them for deliberation; and the tricks of demagogues, excited feelings, party animosities, and the corrupting influences always brought to bear upon popular elections,

would banish reason, reflection, and judgment. If the delegation of the legislative power of the State to the people of a county, to make laws through the medium of a ballot-box; involving in it an abandonment by the legislature, of the trust reposed in them, which they have sworn to execute with fidelity; does not seem to many persons to be destructive of the constitution, and to lead to all the dangers of a democracy, against which the founders of our government were so anxious to guard; it can be only because it is presented under the specious appearance of a profound deference and devotion to the popular will; and because its destructive tendencies are clouded and obscured by the incense of adulation offered to the majesty of the people.

The question then arises, whether the act of the 19th of February last, transfers or delegates legislative power. If it does, it is unconstitutional.

The legislature at their late session, were urged by numerous petitions signed by a large number of very respectable citizens, to refer it to the people to decide, whether the laws licensing the sale of intoxicating liquors should be repealed. If the members of the legislature, by the convictions of their own judgment, were assured that the sad evils of intemperance flowed from the existence of these laws, it was their duty to repeal them; or to introduce such modifications as might destroy their baneful influence. This course was required of them, although the will of the constituents of many of the members might have been opposed to it. The doctrine of the common law is, that a member of a legislative body, although elected by a particular county or district, is bound, in the performance of his functions, to act not merely for the benefit of his own constituents, but for the whole State. The opinions and will of his constituents ought always to command the most respectful attention; but if clearly opposed to his deliberate judgment, to the principles of the constitution, to the dictates of sound morality, or to the public welfare; as an honest and upright man, he ought not to obey them. *The representative* (says Mr. Burke) *owes to his constituents, not only his industry, but his judgment; and he betrays, instead of serving them, if he sacrifices it to their opinions.* Our legislature, acting with the best intentions, and following the precedents set by the legislatures of other States, the constitutionality of which had never been brought to the test of a legal decision,* declined the responsibility which it was their duty to

---

* The Supreme Court of Pennsylvania, whose legislation on this subject was followed, has since decided the Pennsylvania law to be *unconstitutional.*

assume; and thus devolved the performance of their trust on the people of each county; in order that a majority, on whom no responsibility rested, might decide a question, which none had the authority to decide, but the legislature.

The laws licensing the sale of spirituous and vinous liquors are valid laws; and must remain in full force, until repealed or modified by the regular and constitutional exercise of the legislative power; by a law passed by the Senate and House of Representatives, in General Assembly met. No such law has been, or was intended to be passed by the legislature. They purposely avoided it. They merely left the subject to the people of each county to decide by ballot, whether the license laws should be repealed or not, within such county; and until such decision should be made by a majority of the legal voters, the laws were to remain in full force. The people of each county were to act on the subject, and not the legislature. The license laws were to be repealed in a county, not by the will of the legislature, but by the will of a majority of the citizens who voted in such county, although it might be against the will of a majority of the citizens of the State; by the exercise of legislative power by the people of a county, which could not be done by the people of the State: by a law (falsely so called) enacted and passed through the medium of ballot-boxes, and not by a law enacted by the Senate and House of Representatives of the State of Delaware, in General Assembly. The design and true character of the act of the 19th of February last are, to confer the functions of the legislature of the State upon the people of a county; to give them the means of exercising legislative power, by authorizing them to decide by their votes, whether the retailing of intoxicating liquors should thereafter be lawful in their county.

A law when passed by the legislature, is a complete, positive, and absolute law in itself, deriving its authority from the legislature; and not depending for the enactment of its provisions, upon any other tribunal, body, or persons. It may be limited to expire at a certain period; or not to go into operation until a future time, or the happening of a contingency, or some future event; or until some condition be performed. Of this description, are many of the laws of the general government respecting duties and imposts; and laws of our own State respecting private corporations; which latter are not to operate until some condition be performed, or the assent of the corporators be given; because a private incorporation is a contract between the State and the corporators; and therefore, the legislature

cannot compel persons to become an incorporated body; or against their consent, impair, alter, or repeal the rights and privileges conferred by the charter. All such laws are complete and positive in themselves when they pass from the hands of the legislature, and are not to become laws by the creative power of other persons. But the legislature are invested with no power to pass an act, which is not a law in itself when passed, and has no force or authority as such, and is not to become or be a law, until it shall have been created and established by the will and act of some other persons or body, by whose will also existing laws are to be repealed, or altered and supplied. The act of the 19th of February, 1847, is of this character. In a legal sense, it is not a law; it is not complete and positive in itself. It is not a rule prescribed by the supreme power of the State to its citizens, enforcing some duty or prohibiting some act; but was to become a rule only when enacted or sanctioned by the popular vote of a county; and then to be a rule prescribed not by the constitutional legislative power of the State, but by the power of the majority in a county over the minority. Excepting the fifth section, the act of February last in effect, is in the nature of a bill prepared and presented by the legislature of the State to the people of each county, to be enacted or rejected by them. It contains in substance three propositions: 1st. That the Court of General Sessions of the Peace and Gaol Delivery shall not recommend any person or persons for licenses to sell intoxicating liquors; that the retailing of them shall be prohibited as a nuisance, except when sold for medicinal or sacramental purposes, or to be used in the arts. 2d. That it shall be the duty of the same court to license a competent number of persons to keep temperance houses without the sale of intoxicating liquors; and a sufficient number of storekeepers, physicians or apothecaries to sell spirituous and vinous liquors for medicinal and sacramental purposes and to be used in the arts; but for no other purposes whatsoever. 3d. That every person or persons who shall sell or deliver any intoxicating liquors except for the purposes before mentioned, shall be liable to indictment, and on conviction be fined in not less than twenty, nor more than one hundred dollars. The people are called upon to decide the matter by ballot, at the usual places of holding elections. On each ballot is to be written or printed the words " *License* " or " *No License.*" If there be a majority of votes for " *no license,*" the several propositions contained in the act, are by such majority enacted into a law, and the license laws are repealed. If a majority of votes be for " *license,*" the propositions are rejected,

and the license laws continue in full force. There is no substantial difference between this, and the case of a bill introduced into either branch of the legislature. In the latter, the bill becomes a law by a majority of the votes of the members of each house: in the former, by a majority of the votes of the people of a county at an election. But the act of the 19th of February, delegates the legislative power of the State to be exercised by the people of each county, not only in a single instance, but year after year. By the 5th section, whenever one-fourth in number of the legal voters at the last preceding election in any county, shall request the Levy Court to present the question of "*License*" or "*No License*" again to the people, it becomes the duty of the Levy Court to give public notice thereof; and the question is to be again decided by ballot on the next succeeding first Tuesday in April; and so on, in every year in which such written request shall be made. By the constitution of this State, the legislative power cannot be called into action oftener than once in every two years, except by the Governor upon extraordinary occasions; and then to be exercised only by a Senate and House of Representatives. But the 5th section of this act, transcending the constitution, authorizes a minority of voters in each county to call into action every year, the legislative power on this subject, to be exercised by the people of such county through a ballot-box; thus, actually annulling the constitution, and subverting our form of government. But although such absurd and pernicious consequences are the result, the section referred to, is strictly in accordance with the principle and intention of the act itself, which proceeds on the assumption, that as legislative power is derived from the people, it may be transferred back to, resumed, and be exercised by them; and that a law which they make in the exercise of such power, is valid and binding. It is a legal maxim, that the same authority and strength which create an obligation, are required to annul or dissolve it: therefore, if such a misnamed law be valid, it cannot be suspended, changed, or repealed, except in the manner in which it was made, and by the same authority; that is, by means of a popular election, and by a majority of persons voting at such election.

But it is argued, that the act of February last, does not transfer or delegate legislative power: that the legislature have the right to pass conditional laws, which are to commence their operation or to be void upon the happening of some future event, or some contingency: that this act is one of that character, and does not differ in principle from several acts of Congress, and statutes of our own State,

whose validity has been affirmed by judicial decisions. By way of illustration, we are referred to the cases of The Aurora vs. The United States, 7 *Cranch* 382; 2 *Peters' Cond. Rep.* 540; Steward vs. Jefferson, 3 *Harr. Del. Rep.* 335, and Gray vs. The State of Delaware, 2 *Harr. Del. Rep.* 76. In the first case it appears, that on the first of March, 1809, Congress passed an act interdicting the commercial intercourse between the United States and Great Britain and France, commonly called the non-intercourse law; which by the nineteenth section, was to continue in force until a certain period, and no longer; that by the fourth section of the act of Congress of the first of May, 1810, on the same subject, it was declared that in case either of those nations should revoke, or modify her edicts, so that they should cease to violate the neutral commerce of the United States, the president should declare the fact by proclamation; and if the other nation should not within three months afterwards, revoke or modify her edicts in like manner, then that certain enumerated sections of the act of the first of March, 1809, should be revived and be in full force so far as related to such nation; and in regard to the nation revoking or modifying her edicts, that the restrictions imposed by the act of the first of May, 1810, should, from the date of such proclamation, cease and be discontinued.

The Supreme Court of the United States decided that the legislature may make the revival of an act depend on a future event, and direct that event to be made known by proclamation; that there was no sufficient reason why it should not exercise its discretion in reviving the act of March 1, 1809, either expressly or conditionally; and that the nineteenth section of that act could not restrict their power of extending its operation without limitation, upon the occurrence of any subsequent combination of events. There is not the slightest resemblance between the law of Congress and the act of our legislature. The non-intercourse law was complete and perfect in itself when it passed from the hands of its makers. The act of May, 1810, declared it should be revived on the happening of a subsequent event, to be made known by the president's proclamation, which operated simply as a rule of evidence, but did not make or enact the law. Had the president been empowered to repeal existing laws and create a new law, by the exercise of his will, and to announce his decision by a proclamation, as the people of New Castle county were empowered to do by the legislature of this State, and to have their decision announced by the returns of an election, there would be an analogy between the two cases. Were it possible to

suppose such an absurdity on the part of Congress, their act would have been declared void, which thus undertook to transfer the legislative power exclusively to the president, and to abrogate the constitution. In the case of Steward vs. Jefferson, the Court of Errors and Appeals of this State held, that the supplement to the act for the establishment of free schools, authorizing a tax to be laid in each district by a majority of the school voters in such district, was a constitutional law. · It is argued that the power of taxation is legislative power; that this power is delegated by the school law to the voters in each school district authorizing them to raise taxes for the support of their schools; and that the operation of the law so far as regards the tax, depends on the popular vote of the district.

· By the law of this State for establishing and supporting free schools, each school district is constituted a corporation with limited powers; the clear income of the school fund is apportioned among the several counties; the share of each county is divided among the several school districts of such county, and an equal portion given to each, as *a donation;* provided, the voters in such district raise by *subscription* or *tax,* in any one year, a sum equal to *one-half* of such district's share of the school fund. (*Vol.* 8, *Del. Laws* 21.) But no tax can be levied or assessed in any school district, unless upon a vote by ballot there shall be a majority of votes for the tax. (*Vol.* 8, *Del Laws* 171.)

In the distribution of the school fund, the legislature had the right to appropriate an equal portion to each school district, as a donation; and to prescribe as a condition, that before it should be paid, a certain sum should be raised in the district, either by voluntary subscription or by a tax, as should be determined upon by the corporators themselves. No power is granted to them, or to any other persons, to repeal or change any part of the law; nor does its existence or operation depend on the performance of the condition, or in any manner upon the will or acts of the corporators. If the condition be not performed, the defaulting district loses its portion of the fund; which, after a certain period, is appropriated to the support of free schools in the other districts. No ingenuity can discover the shadow of similitude between the act of the 19th of February, 1847, and any part of the school law. To say that the authority given to the school voters—to members of a corporation—to determine whether a tax shall be laid or not, is a grant of legislative power; is an abuse of language. Legislative power is the power of making laws. The making of a law prescribing by what persons, or by

what body, when, and in what manner, taxes shall be laid and col·lected, is the exercise of legislative power. But the making of a resolution, or order, or the determination or direction, by the persons or body appointed for such purpose by the law, that taxes shall be laid and collected, is simply the execution of an authority granted by statute. The collection of them is the performance of a mere ministerial duty. The imposition of taxes, therefore, by managers of marsh companies and other incorporated bodies, and by the Levy Court of a county, is the execution of an authority granted by the statute which appointed them as the proper persons, or body to carry its provisions into effect; and is not the exercise, in any sense of the term, of legislative power.

The case of Gray *vs.* The State of Delaware (2 *Harr.* 76,) does not announce any such principle as that the legislative power of the State may be delegated; and, although the point was argued, the case does not profess to decide it. The decision is merely that the mayor's court of the city of Wilmington has jurisdiction to try cases of assault and battery. It was not necessary to decide that the mayor's court could try such cases without the intervention of a jury, as it appeared from the record, that the plaintiff in error had submitted himself to that mode of trial. (p. 88.) The argument of the learned judge, which appears in the report of that case, goes only to the extent, that as the general assembly had the right under the fifteenth section of the sixth article of the constitution, to confer on the mayor's court, jurisdiction in cases of assault and battery, either with or without trial by jury; it was not a delegation of the legislative power of the State to enact in the city charter, that the mayor's court should have power to try such cases " with or without trial by jury, as should be provided by the ordinances of the said city."

The granting of an act of incorporation is the exercise of legislative power. To make ordinances for its own government, subject to the control of the legislature, and not inconsistent with the constitution and laws of the State or of the United States, is one of the rights inseparably incident to every corporation aggregate. This is implied by law from the very act of incorporation itself, although the charter may be silent on the subject. With what show of reason then can it be said, that the power, whether expressed in the charter or not, to make ordinances for the management of the local concerns of the corporation, and the government of its members, is a transfer or delegation of the legislative power of the State? Or that it is any thing else than the execution of an authority or trust expressly

or impliedly conferred by the act of incorporation: an act which is a complete law in itself, and not in the power of the corporation, or of any body, or set of men, to change, alter, or abrogate, except the legislature; and deriving all its power and efficiency from that source and no other. The city of Wilmington is a municipal corporation, invested by the express terms of its charter, with power to make ordinances, subject to the control of the legislature, for its own local purposes and the government of the city, which can affect none but those who come within its jurisdiction, or who have assented to them, by themselves or their representatives. An ordinance then is but a law of the city. The making of it is the exercise only of the law making power of the city, and the authority to make it cannot be a delegation of the legislative power of the State. Therefore, when the charter gave to the mayor's court the power to hear and determine assaults and batteries, with or without trial by jury, the mode of trial was properly left to be regulated by an ordinance of the city.

But the defendant's counsel contend, that the act of February, 1847, is valid, because it is merely a conditional act; to take effect upon a contingency, upon the result of a popular election. Admitting it in that sense of the term to be a conditional act, and further, that it is an act perfect and complete in itself, and instead of giving power to the people of a county to repeal, enact, change, and re-enact laws, it expressly repealed the license laws and prohibited the sale of intoxicating liquors in every part of the State; but before it shall go into operation, let us suppose that it is to be submitted to the vote, not of the people of a county, but of the people of the whole State, for their approval or disapproval. If approved by the majority, it is to become a law; if disapproved, it is not to become a law. This presents the case in the most favorable point of view for the defendant. But were such the character of the act, it would as clearly be unconstitutional, as it is in its present form. In the one case, the people of the State are constituted a component part of the legislature: in the other, the legislative power of the State is delegated to the people of a county. In the former case, a new power in legislation is introduced, unknown to the constitution; but which the legislature undertake to grant, by requiring the assent or dissent of the people to the enactment of laws; a power commonly called the *veto power;* and which was expressly refused to the executive, by the convention that formed the constitution. In the latter case, by vesting the law making power in the people, the legislature venture

to introduce a pure democracy, and thus to subvert the constitution of this State, and infringe upon that of the United States, which guarantees to every State, a republican form of government. The very object of having two distinct branches of the legislature, and each to act separately from the other, is, to avoid hasty and precipitate legislation, and the evils arising in single assemblies, from passion, prejudice, party animosities, and the intrigues of demagogues. If the legislature were to pass a bill, not by the action of each house separately, (the course prescribed by the common law,) but by both houses in joint meeting, it would be void. But they assume the power of authorizing the people collectively, not of the State, but of a county, to make a law, which the legislature themselves collectively, cannot make.

· It has been argued with much force, that the legislature have no authority to call into action the elective franchise in any other cases, or for any other purposes, than those designated by the constitution: that the peace and harmony of society are not to be invaded, nor the passions of the people excited, by calling them out to vote upon speculative questions of morals or policy: that the meaning of an election and the legitimate object of the ballot-box, is the choice of men to fill public offices, and of representatives to carry out political measures for the interest and welfare of their constituents and the community at large; and that every conceivable case where such an election can be necessary or proper for public purposes, is provided for, by the constitution itself. There is much strength in the argument; and it may be well questioned whether the legislature constitutionally possess such authority. But it is quite certain, that they usurp power when they call on the people to legislate by the ballot-box. If they can refer one subject, they can refer any other, to popular legislation. There is scarcely a case, where much diversity of sentiment exists, and the people are excited and agitated by the arts and influence of demagogues, that will not be referred to a popular vote. The frequent and unnecessary recurrence of popular elections, always demoralizing in their effects, are among the worst evils that can befal a republican government; and the legislation depending upon them, must be as variable, as the passions of the multitude. Each county will have a code of laws different from the others; murder may be punished with death in one; by imprisonment in another; and by a fine in a third: slavery may exist in one, and be abolished in another. The law of to-day will be repealed or altered to-morrow, and every thing be involved in chaos and con-

fusion. The General Assembly will become a body merely to digest and prepare legislative propositions; and their journals a register of bills to be submitted to the people for their enactment. Finally, the people themselves will be overwhelmed by the very evils and dangers against which the founders of our government so anxiously intended to protect them ; all the barriers so carefully erected by the constitution around civil liberty, to guard it against legislative encroachments, and against the assaults of vindictive, arbitrary, and excited majorities, will be thrown down; and a pure democracy, " the worst of all political evils," will hold its sway under the hollow and lifeless form of a republican government.

The only check which the constitution interposes to an act of the legislature tending to such consequences, is an independent and upright judiciary. As the act passed on the 19th of February, A. D. 1847, entitled " An act authorizing the people to decide by ballot whether the license to retail intoxicating liquors shall be permitted among them," is repugnant to the principles, spirit, and true intent and meaning of the constitution of this State, and tends to subvert our representative republican form of government, it is the unanimous opinion of this Court, that the said act is null and void ; and that judgment be rendered, by the Superior Court, for the plaintiff.

HARRINGTON, *Justice.*—Concurring as I do, in the judgment of the Court, as pronounced by the Chief Justice, on the principal question in this cause; I should not add any thing, had I not been particularly referred to as having drawn the opinion in the case of Welcome Gray *vs.* The State of Delaware. That opinion was not delivered; nor is it published as the opinion of the Court. No judgment was pronounced on the point now brought up. If, therefore, there be any thing in it which the deliberate judgment of this Court does not sanction, it can have no authority here. The Chief Justice has said that there is no conflict between the cases; if there was, I hope I should have candor enough to admit and to correct the error, as I had much rather be right, than to be consistent: but the distinction between that case and this is, I think, striking and obvious.

It is conceded by all that legislative power cannot be delegated. That case assumes that the legislature may pass a conditional law. Both of these propositions are true. The error in the argument is in supposing them to be alternative or inconsistent. Doubtless, the legislature may pass many conditional laws; but there are many conditions that would make such laws improper. A law opening a road,

on condition that the owner of the land over which it passes will give it for that purpose : a law for building a bridge, on condition that individuals will contribute to the cost in certain proportions : a law altering, abridging or enlarging the vested powers of corporations aggregate, subject to the consent of such corporations; or a law giving to school districts a portion of the school fund, on condition that such districts will raise an equivalent or proportional sum— are all instances of proper conditional legislation; even though the assent of the corporators in the one case to the change of their charter, or of the district in the other to accept the donation, and comply with its terms, should be signified by a majority vote. These are all good conditions, capable of being performed without in any way interfering with the legislative will. But a law declaring an offence, or providing a punishment, or repealing an existing law, on condition that the Governor, or any other individual, shall assent to it, is as plainly unconstitutional. It is the naked veto power. It substitutes for, or rather adds to, the legislative will, another will which it makes necessary to the *existence* of the law. This is unconstitutional. No one doubts it. No one will pretend that a law with such a condition would be good. Yet what is the difference in principle between that, and the condition of the act of 1847. It " authorizes the people to decide by ballot," whether a new law of the State shall prevail; whether an old law of the State shall be repealed—nay; it goes further, and authorizes the people of a county again and again to repeal or re-enact this law at pleasure, without any return to the legislature, or further expression of their will. Is not this plainly substituting the will of the people for the will of the legislature; is it not in fact, abandoning the power of legislation on the subject? What is the subject matter of this act? The policy of permitting any license for the sale of intoxicating liquor. Who can say from this bill what was the judgment of the last legislature on that subject? The bill, instead of announcing the absolute will of the representatives of the people on this question, gives no intimation of their judgment upon it; but " authorizes " the people " to decide " whether this new law, or the old law, shall be the law of the land. This fact, apparent on the face of the act, would seem to be conclusive against it. There is no power but the legislature that can make the retailing of liquor an indictable offence, or repeal an existing law; and the legislature can neither devolve this power upon another, nor call into operation the will or agency of any other power for this purpose. The act in question assumes to do both; but no man can say from

the law itself, or from the journals of the legislature, whether it was the judgment and will of any member of that body, that the retailing of liquor should be an indictable offence, or that existing laws on that subject should be repealed. Yet it is this judgment and will of the legislature that *is law;* if, therefore, the act give no evidence of legislative will, how can it be a law. Law is a rule of conduct prescribed by legislative power—the result of legislative judgment, and the manifestation of legislative will: this act prescribes no rule, expresses no judgment, manifests no will of the legislature; but leaves it to the judgment and will of the people to " *decide* by ballot whether the license to retail intoxicating liquors shall be permitted among them." The most that can be possibly claimed for such an act as the expression of legislative will is, that it is *to be* a law, enacted by the legislature, on condition that a majority of the people of one of the counties approves of it. But this is the very condition which has been conceded to be unconstitutional in the case of a bill subject to the approval of the Governor. What is the difference? A law depending for its existence on the approval of one man, is the same in principle with a law depending on the approval of any number of men, or of the whole people. For it is not pretended that any legislative power resides in the people, any more than in the Governor. What difference is there, then, between the two cases?

It is much to be regretted that this provisional mode of legislation could not have been tested on some subject concerning which the public judgment was less likely to be influenced by their wishes than on this question of restraining licenses for the sale of liquor. So ardent are the friends of temperance to push forward their good work, and so many hopes are resting upon this act as an effective auxilliary to these efforts, that the principle of the act is in some danger of being concealed by the anxiety to see it established as law. Nor can any one, considering it as closely as he may, and in the light thrown upon it by argument and authority, entirely divest himself of the imposing weight of a popular vote of a large county in its favor, and the concurring voice of many citizens in all the counties engaged in the great cause which this act was intended to subserve. For myself, I can say with perfect truth, that I have met this question hoping to find it compatible with my duty to sustain the law, and yielding reluctantly at last to a contrary conviction. But these are considerations which are limited by higher obligations; and, when the matter to be considered is the constitutional power of the legislature to pass an act authorizing the people to decide by ballot whether

any thing shall be law or not, it is precisely the same whether the subject of such legislation be the restraint of licenses, the punishment of crime, the descent of property, the protection of life or liberty, or any other subject of public policy. Take for instance the question of slavery. It exists by law. It can be abolished by law. If a majority of the representatives of the people in General Assembly met should pass a law to abolish slavery, the citizens would all be bound by it; because all are represented there, and have agreed to be bound by any law thus made. But if the legislature, instead of passing such a law themselves, should direct an election to be held in each county, and make the existence of slavery in such county to depend on a majority vote, upon what principle could such an act be binding? Even the citizens of the county voting have never consented to be bound by the will of a majority expressed in that form; but what shall we say of the citizens of the other counties who have neither vote nor voice in the decision? It is vain to say they are not interested in the matter, as the law is to operate only in the county voting for it; they are all interested in every question of general policy, and must be directly affected by the result; to say nothing about the absurdity of different rules of conduct existing in the several counties on the same general subject of legislation.

I have said that law is a rule of conduct, prescribed by legislative power, commanding what is right, or prohibiting what is wrong. This is the exact definition given by the highest authorities. It is a *rule*—a certain, positive and known principle of action; a rule *prescribed*—fixed upon, defined, ordered and made known; a rule prescribed *by legislative power*—by that depository of sovereignty, or branch of government, whose province it is to make law. No other can prescribe a rule of conduct for the citizen, or announce a *will* that the citizen is bound to obey. Law is never, in this sense, contingent; it is never subject to the discretion of those whose conduct it is designed govern. It is a *command;* not counsel merely, or advice; it prohibits, and does not persuade. It extends its iron sway over the unwilling as well as the willing, and never asks the consent or ratification of any other than the creative power.

It is true that, in this country, law may be said in one sense to depend on the consent of the citizens; but it is a general consent expressed through their representatives in the act which makes the law, and never depends on subsequent individual approval. The people have agreed to be bound by the judgment and will of their representatives, as expressed in their legislative acts, because all the people are

there represented; but they have never agreed to be bound by the judgment and will of a majority of the citizens of any county, where they are in no respect represented. Neither have they ever agreed that their representatives should place them in this dilemma. It is the right and the duty of the representatives of the people in legislature assembled to make the law according to their own judgment. In this judgment the people confide; in this body the people are all represented; and by its judgment, as expressed in the law which it announces, the people are all bound, for the very reason that it is their own act, done by their authorized agents. But when these representatives, by an imperfect legislative act, assume to subject their constituents to the judgment and will of any other body, however numerous; expressed in any other form, however imposing; the delegation of such power is unauthorized and invalid, and the execution of it is not an act of legislation but of usurpation, which the citizen is not obliged, and the other departments of government are not at liberty, to obey.

The validity of by-laws of corporations rests on the same principle of consent. They are local in their character; generally unimportant in their bearing on public interests; and binding only on the members of the corporation, or strangers who voluntarily place themselves within the corporate jurisdiction. The right of the legislature to bestow on corporations the power of internal regulation; and the capacity of corporations to receive and exercise such power, even though it involve legislative power within the corporate limits, exist at common law, and are recognized by the constitution. (*Art.* 2. *sec.* 17; *Art.* 7, *sec.* 8.)

The case of Gray *vs.* The State is pressed upon us as a case of conditional legislation. Granted. But the condition was one that might be lawfully performed. And this is the very matter in issue. A law creating an offence, and punishing it, on condition that the governor, or any other individual, or any number of individuals, shall approve of it, is *void;* because the legislature *cannot* constitutionally confer on any individuals such a power: a law giving the mayor's court of Wilmington power to try assaults and batteries, and leaving it to the judgment of the city council to decide whether the mode of trial shall be by jury; or not, is a *good law ;* because the city council *has* the constitutional power to decide this very matter. The mayor's court is the court of a *corporation;* and the city council is the legislature of the corporation. It has power to regulate the mode of trial in its own court. A municipal corporation in

a State, is a government within a government; having all the powers within the sphere of its action, of any other government, legislative, judicial, and executive. The power to enact by-laws is inherent in such a corporation. It was expressly granted to this corporation in both its charters. " Sec. 5. The members of the council shall constitute the *legislative* body of the said city," with full power to pass laws for the government of the corporation. When, therefore, the jurisdiction of the mayor's court was extended to assaults and batteries by act of assembly, it was very properly left to the *legislature* of this corporation to decide upon the mode of trial; a matter directly within their constitutional power. Now, the question in that case was, whether the city council was a body upon which the legislature could devolve the power of deciding the mode of trial in the mayor's court, and the question is answered by the statement of the case itself. The city council, as the legislature of this corporation, had by common law, and also, by grant, long prior to this act, full power to pass laws for the punishment of certain offences within this city, as well as to regulate the mode of trial; and, the law referred to, only recognized that power in a body which was perfectly capable of executing it. Had the legislature said nothing about the mode of trial, the city council would have had power to regulate it. The act now under consideration does not, therefore, derive any support from the opinion cited, even if that opinion had the force of a decision. Until it can be shown in this case that " a majority of the people " in each county, have the constitutional power " to decide by ballot" whether a new criminal offence shall be created, and an existing law repealed; both of which are acts of the highest legislation; an act of the general assembly " authorizing " them to do so, can find no support by comparison with a law authorizing the legislature of a corporation to perform an ordinary act of legislation, within the scope of its constitutional powers. The people of a county— nay, the people of the State, have no such constitutional power. They parted with it for their own good, when they " vested " it in " a general assembly, to consist of a Senate and House of Representatives;" and it is not in the power of the general assembly to return it to them. Gloomy, indeed, would be the prospect for this, or any other representative republic, if the people themselves should ever withdraw this power from their representatives, to exercise it through the medium of legislative ballot-boxes. All history teaches, not only that this would lead to anarchy and despotism; but that it is itself a state of anarchy. Fortunate it is for us, that our wise and patriotic

ancestors, have interposed between us and such a state, the restraints of the constitution; which neither the judiciary, nor the legislature, nor the people themselves, will ever disregard, when the true principles of the constitution come to be considered, and fully understood.*

*The Chancellor.*—I concur in the opinion of the court as delivered. It may, perhaps, be expedient for me to present in addition to what has been said there, a brief argument which appears to me decisive upon the question.

The action of power I regard as distinct from the power itself. Law is the result of the legitimate action of legislative power. The people, in the exercise of their sovereign power, make the organic or fundamental law; which, as the constitution of the State, is un-

---

* The Supreme Court of Pennsylvania has expressed the same views, not only on the general question, but on the particular distinction here contended for. In the case of the borough of West Philadelphia, (5 *Watts & Serg.* 283,) *Chief Justice Gibson,* delivering the opinion of all the court, said—" *Under a well-balanced constitution, the legislature can no more delegate its proper function, than can the judiciary.* It is on the preservation of the lines which separate the cardinal branches of the government, that the liberties of the citizen depend; for a consolidated sovereignty, in whatever form, is a despotism, in so far as it subjects the governed, not to prescribed rules of action, to which he may safely square his conduct before-hand, but to the unsettled will of the ruling power, which cannot be foreseen; and a government becomes consolidated in proportion as its legislative branch abandons its own functions, or usurps those which have been vested elsewhere. In the very constitution of things, the whole people of a State cannot assemble together to exercise their sovereign power in person; and it is not to be regretted that they cannot, for their rule being untrammelled by any thing but their own will, would be as arbitrary and fitful in its exercise as any other uncontrolled domination. When they delegate it to an undivided agency, they slip their hold on it, and in turn become its slaves. These are considerations to show that the exercise of a doubtful power under the constitution, is not to be extended by implication, even where the lines of demarcation are so fine as to be almost invisible. *The legislature may certainly authorize a corporation to enact ordinances and by-laws;* for these are not only incidental, but rules of self-government, such as any other individual may prescribe for his own conduct; and it may also authorize voluntary associations to assume corporate powers in specific cases; *on the performance of certain conditions,* as it has done in the case of associations for literary, charitable, or religious purposes."

alterable, except in the mode it prescribes, or by revolution. The constitution being established by the sovereign power, exists as the expression of that will, and constitutes the agreement or social compact under and in conformity with which the citizens assent to be governed. Hence, the constitution is always held to be the paramount law; and, being the expression of the sovereign will, must necessarily control and invalidate every act of an inferior power when in conflict, or subversive. In the State of Delaware, the constitution has defined and distributed the different powers of government, executive, legislative, and judicial. They are respectively derived from, and exist under the constitution; and, whenever their action would destroy the constitution, it becomes suicidal. The offspring must inevitably perish with the parent; the branches cannot survive the destruction of stock and root. These general principles I apprehend will not be questioned. It is also evident that the powers delegated must not only act in the appropriate sphere, but also, in the legitimate mode or manner essential to effect a valid act. Hence, the legislative power, as it exists under our constitution, cannot depart from the sphere of municipal legislation, except its action conforms to the amendment as prescribed in the constitution itself. In like manner, the action of the legislative power, when exercised in order to produce a valid law, must be in accordance with the mode of action prescribed in the constitution; otherwise, the result cannot be pursuant to the agreement as contained in the social compact; and, therefore, not obligatory on the citizen. To illustrate and explain the principle, I will advert to the constitutional provision relative to the action of the legislative power, and the delegation thereof. In the 2d article of the constitution of the State, sec. 1st., " The legislative power of this State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives." Sec. 6. " A majority of each house shall constitute a quorum to do business." Sec. 8. " Each house shall keep a journal of its proceedings." Hence, it is obvious the legislative power is vested, not in a single body, but in two—a Senate and House of Representatives; and by sections six and eight, it is manifest the action of each, in the exercise of the power, is required to be several; although no bill can become a law without passing both houses. Thus each is a check on the other; and the constitution, by this provision, has intended protection against hasty and injudicious legislation. Suppose the legislature should resolve to meet in joint session, and as a single body enact laws, thus varying the mode or manner of action of the legislative

power, although the power would exist in the component parts of the body, yet action would be incapable of making a constitutional law. If then the joint action of the body possessing the power separately, cannot, in consequence of the irregular mode of action, make a law, it would seem impossible for the mind of man to imagine any ground capable of sustaining the position, that a law of the State of Delaware can be made by a popular vote that would be constitutional; even should it be by a majority of the votes of all the citizens thereof who were entitled to exercise the right of suffrage. But when it is impossible to find the law making power either in existence or action in the popular vote of a State, it would certainly be useless to expect to find it in a minority, or in a county. Should it be thus abandoned by its depositaries, I hope the spirit and em- phatic language of the Delaware constitution, announced by an inde- pendent judiciary, will always, with an intelligent people, be found an adequate and sufficient remedy.