No. 46,952

Tom R. Van Sickle [substituted for Walter H. Peery], Clay E. Hedrick, *Appellants*, v. Elwill M. Shanahan, Secretary of State, *Appellee*.

(511 P. 2d 223)

Opinion filed June 9, 1973.

*Earl C. Moore,* of Wichita, argued the cause and was on the brief for appellants.

*Donald R. Hoffman,* assistant attorney general, argued the cause, and *Vern Miller,* attorney general, and *John R. Martin* and *Jim Payne,* assistant attorneys general, were with him on the brief for appellee.

*Robert E. Hoffman,* of Topeka, *Larry D. Nuss,* of Fort Scott, and *Tom R. Van Sickle,* pro se, of Fort Scott, were on the brief Amicus Curiae.

The opinion of the court was delivered by

FATZER, C. J.: This action challenges the validity of an amendment to the Constitution of the state of Kansas purporting to revise Article 1 relating to the executive branch of the state government.

The action was brought by former state treasurer, Walter H. Peery, and state auditor Clay E. Hedrick. On appeal, Tom R. VanSickle, who succeeded Walter H. Peery as state treasurer, was substituted as appellant. The amendment abolished the offices of state treasurer and state auditor as constitutional offices, as of the end of the two-year term which began January 8, 1973.

To place the issues before this court in their proper perspective, the history of the challenged amendment and other amendments directly affecting it, will be briefly discussed. (See *Moore v. Shanahan,* 207 Kan. 645, 486 P. 2d 506.)

Prior to the general election on November 3, 1970, the last sentence of Section 1, Article 14, of the Kansas Constitution, relating to constitutional amendments, read:

". . . When more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately; and not more than three propositions to amend shall be submitted at the same election."

At the general election, November 3, 1970, Proposition No. 2 to amend Article 14, Section 1, was submitted to the electors (House Concurrent Resolution No. 1033 [L. 1970, Ch. 411]), and they added to the above quoted provision by the adoption of the proposition, the following:

". . . When more than one amendment shall be submitted at the same election, such amendments shall be so submitted as to enable the electors to vote on each amendment separately. *One amendment of the constitution may revise any entire article*, except the article on general provisions, and in revising any article, the article may be renumbered and all or parts of other articles may be amended, or amended and transferred to the article being revised. Not more than five amendments shall be submitted at the same election." (Emphasis supplied.)

In *Moore v. Shanahan*, supra, this court sustained the validity of the amendment (Proposition No. 2) to Article 14, Section 1, and the question of its validity will not receive further attention.

At the same general election, November 3, 1970, Proposition No. 3 was submitted to the electors (House Concurrent Resolution No. 1026 [L. 1970, Ch. 347]) to amend Article 1, relating to the executive branch of the state government, and to repeal Article 8, relating to the militia of the state. The amendment submitted at the general election 1970, is almost identical to the amendment we now have before us, except the former proposed amendment also included Article 8 relating to the militia. That amendment was adopted at the 1970 general election but declared invalid in *Moore v. Shanahan*, supra, because the proposition contained more than one subject not related to, dependent upon, or required for the operation of the other, in violation of the amendment procedures of Article 14, Section 1, of the Kansas Constitution—the revision of Section 1 not having as yet become effective. (See *Moore*, p. 650.)

The 1972 Session of the Kansas legislature submitted to the electors of the state an almost identical proposition to amend Article 1 of the Kansas Constitution as was submitted at the general election in 1970. However, Article 8, relating to the militia of the state, which was previously included in Proposition 3, was excluded. (Senate Concurrent Resolution No. 46 [L. 1972, Ch. 390].) At the general election on November 7, 1972, S. C. R. No. 46 to amend the Constitution by revising the executive article was approved by the electors, and it is this amendment that is being challenged in this litigation.

The amendment adopted November 7, 1972, is summarized in considerable detail and quoted in part.

Section 1 provided the tenure for the offices of the executive department, and limited its composition to the governor, lieutenant governor, secretary of state, and attorney general. The section eliminated the offices of auditor and treasurer from that department, which were provided for in existing Article 1, Section 1. (The

office of superintendent of public instruction had been eliminated by the amendment of Article 6—education—in 1966.) The tenure of office of governor, lieutenant governor, secretary of state, and attorney general was extended from two years to four years, and commencing in the year 1974, and every four years thereafter, elections for those offices are to be held in off-presidential years. Commencing in the year 1974, and thereafter, the candidates for governor and lieutenant governor will be nominated and elected jointly as a "team," so to speak, so that a single vote would be cast for a candidate for governor and for lieutenant governor running together. It was further provided that after 1974, no person may be elected to more than two successive terms as governor and lieutenant governor.

Section 2, providing for a Board of Election Canvassers, was repealed.

Sections 3, 4 and 5, as submitted by the legislature, incorporated and transferred with minor changes existing provisions of the Constitution which vested in the governor, as executive power, the responsibility to see that the laws are faithfully executed (Section 3), and the power to require in writing reports from officers of the executive department and of all public state institutions, which shall be transmitted by the governor to the legislature. The latter clause was transferred from Section 16, which was repealed. The sections further empowered the governor to convene the legislature in special session by proclamation, and a new clause was added authorizing the legislature to convene into special session upon petition signed by at least two-thirds of the members elected to each house. The power to adjourn the legislature in case of disagreement between the two houses as to time of adjournment, was transferred from old Section 6. Since Section 6 contains the focal point of the appellants' attack upon the validity of SCR No. 46 [L. 1972, Ch. 390], we quote it in full:

"Sec. 6. *Reorganization of state agencies of executive branch.* (a) For the purpose of transferring, abolishing, consolidating or coordinating the whole or any part of any state agency, or the functions thereof, within the executive branch of state government, when the governor considers the same necessary for efficient administration, he may issue one or more executive reorganization orders, each bearing an identifying number, and transmit the same to the legislature within the first thirty calendar days of any regular session. Agencies and functions of the legislative and judicial branches, and constitutionally delegated functions of state officers and state boards shall be exempt from executive reorganization orders.

"(*b*) The governor shall transmit each executive reorganization order to both houses of the legislature on the same day, and each such order shall be accompanied by a governor's message which shall specify with respect to each abolition of a function included in the order the statutory authority for the exercise of the function. Every executive reorganization order shall provide for the transfer or other disposition of the records, property and personnel affected by the order. Every executive reorganization order shall provide for all necessary transfers of unexpended balances of appropriations of agencies affected by such order, and such changes in responsibility for and handling of special funds as may be necessary to accomplish the purpose of such order. Transferred balances of appropriations may be used only for the purposes for which the appropriation was originally made.

(*c*) Each executive reorganization order transmitted to the legislature as provided in this section shall take effect and have the force of general law on the July 1 following its transmittal to the legislature, unless within sixty calendar days and before the adjournment of the legislative session either the senate or the house of representatives adopts by a majority vote of the members elected thereto a resolution disapproving such executive reorganization order. Under the provisions of an executive reorganization order a portion of the order may be effective at a time later than the date on which the order is otherwise effective.

"(*d*) An executive reorganization order which is effective shall be published as and with the acts of the legislature and the statutes of the state. Any executive reorganization order which is or is to become effective may be amended or repealed as statutes of the state are amended or repealed."

Section 7 as submitted by the legislature was the only section not changed. It vests the pardoning power in the governor under regulations and restrictions prescribed by law.

Section 9 as submitted by the legislature incorporated the provisions of old Section 8 providing that there shall be a state seal which shall be kept by the governor and used by him officially, and continued in effect its former provisions with respect to the issuance of all commissions.

Section 11 as submitted by the legislature contained a similar subject to that contained in existing Sections 11, 13 and 14. Section 11 provided that the liteutenant governor shall succeed the governor, but provided that succession of the lieutenant governor shall be as prescribed by law, rather than constitutional succession as prescribed in existing Section 13, which was repealed. Section 14 was likewise repealed, and its provisions concerning the appointment by the governor of members of the state executive department who become incapable of performing their duties, were transferred to Section 11.

Section 12 as submitted by the legislature, repealed the provisions

of existing Section 12 which provided that the lieutenant governor shall be president of the Senate and empowered to vote when the Senate is equally divided, and that the Senate shall choose a president pro tem to preside over that body in the lieutenant governor's absence, or when he succeeds to the office of governor. Section 12 as proposed provided that the lieutenant governor shall assist the governor and exercise the powers and duties prescribed by law.

Section 15, relating to compensation of members of the executive department, was amended in certain respects.

The appellants alleged in the district court and renew their contention on appeal, that the proposition in question contained *more than one amendment* and violates the procedural limitation in Article 14, Section 1, of the Kansas Constitution, as amended in 1970, which reads:

". . . When more than one amendment shall be submitted at the same election, such amendments shall be so submitted as to enable the electors to vote on each amendment separately . . ."

The appellee contends the scope of Section 1 of Article 14 was made much broader by the 1970 amendment which added the following:

"One amendment of the constitution may revise any entire article, except the article on general provisions, and in revising any article, the article may be renumbered and all or parts of other articles may be amended . . ."

The district court, in its decision of August 23, 1972, reached the following conclusion concerning the merits of the appellants' argument:

"It is the judgment of this Court that the present Article 14, Sec. 1 of the Kansas Constitution, providing for 'Constitutional amendment and revision' is a complete departure from Article 14 on 'Amendments' as existed at the time of the decision in the case of *Moore v. Shanahan,* Supra, and that it greatly expanded and broadened the amending process making it permissible to *revise* whole articles of the state constitution. This was undoubtedly done for the purpose of simplifying and readily modernizing the amending process to make changes necessary in the Kansas Constitution to meet the needs of government in these rapidly changing times."

We agree with the conclusion of the district court.

In considering the propriety of a concurrent resolution to submit a proposition to amend the Constitution, this court must be mindful of the rule announced in *Moore v. Shanahan,* supra, where we said:

"We also refer to the rule that the constitutionality of a statute or concurrent resolution is presumed, and that all doubts must be resolved in favor of their

validity, and before they may be stricken down, it must appear the infringement of the Constitution is clear beyond substantial doubt . . ." (l. c. 651.)

The appellants refer to *Moore v. Shanahan,* supra, and contend the amendment submitted by SCR No. 46 contains at least six different subjects for a "yes" or "no" vote by the electors and that the sentence still remaining in the amendment, "when more than one amendment shall be submitted at the same election, such amendment shall be so submitted as to enable the electors to vote on each amendment separately," is made a restriction on the provisions added to Article 14, Section 1, that "one amendment of the Constitution may revise an entire article . . ." We quote from their brief:

". . . The question before this Court is, did the inclusion of the 'one amendment may revise any entire article' cancel this court's right to strike down a vicious amendment even though it is a one-article amendment? It is the contention of the plaintiff that this court has not lost the right to apply the test of 'one amendment' even though it is revising a whole article."

This court cannot ignore the qualifying language in Section 1 of Article 14, as amended by the electors in 1970. The addition of language authorizing an amendment which "may revise an entire article, except the article on general provisions" was inserted to accomplish some purpose or design. To hold the additional language mere surplusage cannot be rationalized in any logical manner and still avoid a conclusion that the result in *Moore v. Shanahan,* supra, was not an appropriate constitutional construction. We therefore hold an entire article of the Kansas Constitution may be revised in a single amendment and still enjoy the benefit of judicial approval.

The appellants, realizing the clear meaning of the additional language in Section 1 of Article 14 as authorizing the revision of an entire article as a single amendment, argue that unless the phrase "[w]hen more than one amendment shall be submitted at the same election, such amendment shall be so submitted as to enable the electors to vote on each amendment separately" is construed to be a restriction on the new language defining "one amendment," the entire Constitution could be amended by converting it into one article.

In response to such speculation, this court notes it is dealing in the instant case with a revision of one article—that relating to the executive branch of the state government. A far different question would be presented should the legislature submit a proposition to amend the entire constitution by incorporating some or all of

its separate and distinct provisions into a single article which would of necessity be composed of matters considered non-germane to traditional notions of a Constitution consisting of separate articles, each relating to distinct, generalized subjects, interrelated to form a viable republican government. Since such a conglomerate article is not now before us, this court does not intend to engage in a lengthy treatise on the myriad of problems which could be envisioned by consideration of a proposed amendment containing such misguided reform. It is sufficient to say the proposition under consideration does not suffer from such impediments, and in our opinion was lawfully presented to the electorate on November 7, 1972.

As indicated Article 14, Section 1, contains its own definition of what an amendment may lawfully consist of—"one amendment of the Constitution may revise an entire article . . ." That being the case, this court is bound by such definition and concludes SCR No. 46 suffers from no procedural deficiencies in its submission to and approval by the electors.

The appellants next contend that even though the 1972 amendment to Article 1 pertaining to the executive department complies with Section 1 of Article 14 as amended, the amendment is invalid because Section 6 violates Article IV, Section 4 of the Constitution of the United States. The article provides insofar as material here:

"The United States shall guarantee to every State in this Union a Republican form of Government . . ."

Necessarily incident to a determination of the appellants' second contention is the further question whether the enforcement of the guaranty clause is justiciable by this court—the appellee claims the question here involved falls within the class of questions deemed to be "political" and beyond the jurisdiction of courts to consider.

In addition to the foregoing, we note the question involved was neither before the district court nor considered by it in reaching the conclusion SCR No. 46 was entitled to judicial approval. However, this fact is not fatal to a consideration of the contention. In *State v. Nelson*, 210 Kan. 439, 502 P. 2d 841, this court discussed the guidelines for consideration of constitutional questions not raised by parties on appeal, and held:

"The constitutionality of a statute should be considered in any action where it is necessary in order to determine the merits of the action or where the issues cannot be intelligently decided without doing so, notwithstanding the failure of the parties to raise the constitutional question, failure to plead the question, or failure to present the question to the trial court." (Syl. ¶ 4.)

This court has concluded the guaranty clause contention is within the purview of the *Nelson* rule and the justiciability of that issue is properly subject to appellate review.

The appellee's argument that the issue is "political" and therefore nonjusticiable, is based upon the authority of *Luther v. Borden, et al.*, 48 U. S. 1, 12 L. Ed. 581. *Luther* was an action in damages for trespass. It arose out of Dorr's Rebellion of 1841. Disenfranchised citizens of Rhode Island took the initiative and proceeded to elect a constitutional convention by universal suffrage. The convention, in opposition to the charter government, proceeded to adopt a new constitution by a majority of the adult male population, and under the leadership of its governor-elect Dorr, attempted to take control of the state from the charter government. There were minor skirmishes with the government in power, and eventually the rump government was abandoned. During the course of the insurrection, the charter government declared martial law and representatives of that government's militia broke into Luther's house to arrest him. Luther contended the martial law was of no effect, as the charter government had been displaced by the Dorr regime, thus the militia was without authority to trespass upon his premises. *The single question to be resolved was which of the two governments was legitimate.*

The United States Supreme Court declined to consider the issue because it was political and beyond the jurisdiction of the judiciary. The ruling was premised upon congressional action which authorized the president exclusive power to resolve such matters under Article IV, Section 4, and a 1795 statute which empowered the president to call out the milita at the request of a state government. The court reasoned the power to determine which government was legitimate had been placed with the president, with knowledge that the president had recognized the governor of the charter government as the exclusive power of Rhode Island—thus with authority to dispatch the milita to the aid of the charter government. The court held it would not be justified in recognizing the Dorr regime as the lawful government under such circumstances.

The appellee relies upon *Luther* as forever barring the judiciary from invoking the guaranty clause to protect the citizens from non-republican state authority. The position follows from dicta in *Luther:*

"Under this article of the Constitution it rests with Congress to *decide what government is the established one in a State.* For as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not. And when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. *And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal.* It is true that the contest in this case did not last long enough to bring the matter to this *issue; and as no senators or representatives* were elected under the authority of the government of which Mr. Dorr was the head, Congress was not called upon to decide the controversy. Yet the *right to decide is placed there, and not in the courts."* (p. 42.) (Emphasis supplied.)

It cannot be said from that language or the holding that the case is authority for the proposition that all challenges to state government under the guaranty clause are "political," and, therefore, nonjusticiable. Rather, the matter became political because a coordinate branch had been assigned the duty to resolve the issue, thus preempting the court from consideration of the matter. There, the question was to be resolved by the president and the congress. (See pp. 38-45.)

Subsequently, in *Pacific Telephone Co. v. Oregon,* 223 U. S. 118, 56 L. Ed. 377, 32 S. Ct. 224, the decision in *Luther* was cited as authority for holding the issues raised by *Pacific* to be "political" and unenforceable. In *Pacific* legislation was adopted by means of the Oregon constitutional initiative and referendum procedure, and it was claimed by reason thereof, the government of Oregon was nonrepublican—the legislative power having been vested in the people and not the legislature, hence the legislation was void. In *Pacific* it was said:

". . . The defendant company does not contend there that it could not have been required to pay a license tax. It does not assert that it was denied an opportunity to be heard as to the amount for which it was taxed, or that there was anything inhering in the tax or involved intrinsically in the law which violated any of its constitutional rights. If such questions had been raised, they would have been justiciable, and therefore would have required the calling into operation of judicial power. Instead, however, of doing any of these things, the attack on the statute here made is of a wholly different character. *Its essentially political nature is at once made manifest by understanding that the assault which the contention here advanced makes is not on the tax as a tax, but on the State as a State. It is addressed to the framework and political character of the government by which the statute levying the tax was passed. It is the government, the political entity, which (reducing the case*

*to its essence) is called to the bar of this court, not for the purpose of testing judicially some exercise of power assailed, on the ground that its exertion has injuriously affected the rights of an individual because of repugnancy to some constitutional limitation, but to demand of the State that it establish its right to exist as a State, republican in form."* (p. 150.) (Emphasis supplied.)

In short, the holding in *Pacific* was that courts will not consider the merits of a lawsuit where the aggrieved party is challenging the state government as a political entity. This court cannot conclude the rule adopted in that case adjudicated all questions arising under the guaranty clause to be nonjusticiable. Moreover, modern analysis of the guaranty clause leads to the conclusion that neither *Luther* nor *Pacific* are authority for the proposition that all questions arising under the guaranty clause are nonjusticiable. While decided upon the equal protection clause of the Fourteenth Amendment, *Baker v. Carr*, 369 U. S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691 provides insight into the justiciability of the guaranty clause and dicta therein is supportive of the conclusion that all issues arising under Article IV, Section 4, are not axiomatically barred as "political" in character. In *Baker* there is a lengthy analysis of cases arising under the guaranty clause. In summation it is said:

"But it is argued that this case shares the characteristics of decisions that constitute a category not yet considered, cases concerning the Constitution's guaranty, in Art. IV, § 4, of a republican form of government. A conclusion as to whether the case at bar does present a political question cannot be confidently reached until we have considered those cases with special care. *We shall discover that Guaranty Clause claims involve those elements which define a 'political question,' and for that reason and no other, they are nonjusticiable . . . ."* (pp. 217, 218.) (Emphasis supplied.)

(For further analysis of guaranty clause cases see *Baker*, pp. 222-226, also the concurring opinion of Mr. Justice Douglas, pp. 241-243, and the dissenting opinion of Mr. Justice Frankfurter, pp. 297-298.)

Finally, in *Reynolds v. Sims*, 377 U. S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362, the court again recognized that some questions arising under the guaranty clause may not be "political" so as to preclude judicial enforcement:

". . . As we stated in *Baker v. Carr*, some questions raised under the Guaranty Clause are nonjusticiable, where 'political' in nature and *where there is a clear absence of judicially manageable standards."* (p. 582.) (Emphasis supplied.)

This court, having carefully reviewed the cases cited by the appellee, has concluded the contention all cases arising under the guaranty clause are nonjusticiable has no historical precedent. Instead, as in

other cases wherein the "political" controversy bar to judicial enforcement has been raised, we must look to the facts and circumstances surrounding the litigation, as well as the theory upon which the constitutional challenge is premised, to ascertain whether the issue may be resolved by the judicial process. (Bonfield, The Guaranty Clause of Article IV, Section 4: A Study in Constitutional Desuetude, 46 Minn. L. R. 513 [1962]; Bonfield, *Baker v. Carr*: New Light on the Constitutional Guarantee of Republican Government, 50 Calif. L. R. 245 [1962]; Emerson, Malapportionment and Judicial Power, 72 Yale L. J. 64, 67-68 [1962]; Bean, The Supreme Court and the Political Question: Affirmation or Abdication?, 71 W. Vir. L. R. 97 [1969]; *Kohler v. Tugwell*, 292 F. Supp. 978, [E. D. La. 1968].)

Having concluded the guaranty clause may provide a basis for challenging state action, the matter of justiciability in the instant case is still left unanswered. The issues raised by the appellants, while not barred from judicial enforcement merely because they arise under the guaranty clause, still may be unenforceable as coming within the scope of a "political" controversy. In *Coleman v. Miller*, 146 Kan. 390, 71 P. 2d 518, affirmed 307 U. S. 433, 83 L. Ed. 1385, 59 S. Ct. 972, the United States supreme court had occasion to pass upon the qualities of political questions:

"It would unduly lengthen this opinion to attempt to review our decisions as to the class of questions deemed to be political and not justiciable. In determining whether a question falls within that category, the appropriateness under our system of government of attributing finality to the action of the political departments and also *the lack of satisfactory criteria for a judicial determination are dominant considerations* . . ." (pp. 454, 455.) (Emphasis supplied.)

In addition, standards were set out in *Baker v. Carr*, supra, establishing elements which would render an issue "political" in character, therefore unenforceable by the judiciary:

". . . Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or in unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements of various departments on one question."

As noted by the analysis in *Baker*, there exists in the instant case no textually demonstrable commitment of the guaranty clause's enforcement to any of the other branches of our state government. Certainly there is no greater danger of conflict with the positions of the other branches in this case than there would be in other matters wherein the constitutionality of state action is challenged, nor would a decision on the merits indicate disrespect for a coordinate branch of the government. There is no indication of a "political" decision made concerning the validity of the state action challenged. In addition, and as hereafter concluded, there are sufficient historical precedents to delineate judicially discoverable and manageable standards for resolving the issues at bar. In short, we find none of the traditional elements of a "political" controversy which would indicate want of jurisdiction to consider the merits of the question raised by the appellants.

Moreover, there is precedent for a conclusion that state courts have the power to consider questions arising under the guaranty clause where the matters to be resolved are not political in character. See *Rice v. Foster*, 4 Del. (4 Harr.) 479, and *Kadderly v. Portland*, 44 Ore. 118, 74 Pac. 710. In fact, in *State, ex rel., v. City of Hutchinson*, 93 Kan. 405, 144 Pac. 241, this court considered a question arising under the guaranty clause, and held the issue was justiciable, and that the initiative and referendum was not repugnant to Article IV, Section 4, guaranteeing to the states a republican form of government.

Finally, there exists another reason why the issues raised in this case are justiciable. Unlike the attacks upon the state government as an entity in *Luther* and *Pacific*, the appellants here do not challenge the existence of the government. Indeed, both are elected officials of the state government. It must be emphasized they seek to adjudicate those powers conferred upon the executive as allegedly violating the republican form of government, and do not seek to adjudicate whether the state government as an entity is a nullity because Section 6 is in violation of the guaranty clause. With that distinction in mind, we now proceed to consider the merits of the guaranty clause and other questions urged by the appellants.

An outstanding feature of the American constitutional system is the separation of the legislative, executive, and judicial powers of the government. The governments, both state and federal, are divided into three departments, each of which is given the powers and functions appropriate to it. Thus a dangerous concentration of

power is avoided, and also the respective powers are assigned to the department best fitted to exercise them.

Generally speaking, the legislative power is the power to make, amend, or repeal laws; the executive power is the power to enforce the laws, and the judicial power is the power to interpret and apply the laws in actual controversies. As Chief Justice John Marshall said in *Wayman v. Southard*, 23 U. S. 1, 46, 6 L. Ed. 253, 263, ". . . The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law . . ."

Like the Constitution of Kansas, the United States Constitution contained no express provision requiring the separation of powers, such as is found in some state constitutions, but the separation is accomplished by the establishment of the three branches of government and the distribution of the various sovereign powers to each of them.

Thus we come to the decisive question in the case—do the provisions of Article IV, Section 4 of the United States Constitution, heretofore quoted, require the conclusion that the doctrine of separation of powers is an inherent concept of a republican form of government, and is a guarantee to the people of the states that the powers inherently belonging to one department may not be vested by the people in another department of that government.

In a case involving representation in the Legislature (*Harris v. Shanahan*, 192 Kan. 183, 387 P. 2d 771) this court considered elements of a republican form of government, *i. e.*, whether the right of suffrage is a fundamental right of a republican form of government to be exercised in a free and unimpaired manner, and it concluded that the right is basic to a republican form of government and the bedrock of our free political system. It was also concluded that the republican form of government is designated to function through representatives chosen by the people on regularly recurring election days and responsible to them, which is premised upon the fact the people cannot speak in mass, and the right to choose a representative is every citizen's portion of sovereign power. In the opinion it was said:

"When the founding fathers wrote the Constitution of the United States they enthusiastically established a republican form of government which became the cornerstone of American written constitutions. (James Madison's report of the 'Debates in the Federal Convention of 1787' [House Document No. 398, 69th Congress, first session, entitled 'Documents Illustrative of the Formation of the Union of the United States of America.'].) So there could

be no mistake about its object and purpose, the American Republic officially and with the first breath of its new life declared, 'that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed.' (The Declaration of Independence.) This is the American proclamation of freedom and equality, and the individual worth of a single human being. Within its designated sphere of constitutionally allocated powers, and subject always to its guiding purpose as stated in the Declaration of Independence, the American system of Government was designed to function through representatives chosen by the people and responsible to them on regularly recurring election days. Article 4, Section 4, of the Constitution of the United States guarantees to every state in the Union a republican form of government and every sentence and provision of the Kansas Constitution evidences principle of that form of government declaring and guaranteeing the liberties of the people. *A distinguishing feature of this form of government is that the people are capable of self-government and have the right to choose their own officials for governmental affairs and enact their own laws pursuant to the legislative power reposed in representative bodies. This representative system is the essence of the republican form of government and is premised upon the fact that the people cannot speak in mass, and the right to choose a representative is every citizen's portion of sovereign power.*" (l. c. 203, 204.) (Emphasis supplied.)

James Madison's notes on the Federal Constitutional Convention are the primary source of the historical interpretation of the guaranty clause. Madison indicates on Tuesday, May 29, 1787, the members assembled began to consider substantive matters in revising the federal system of the United States. Governor Edmund Randolph, of Virginia, opened the main business, and brought forth the principle of a federal government consisting of three separate branches. He outlined the defects in the Articles of Confederation and proposed a remedy for those defects, the basis of which, he concluded ". . . must be the republican principle." (James Madison's Report of the "Debates in the Federal Convention of 1787" [House Document No. 398, 69th Congress, First Session, entitled "Documents Illustrative of the Formation of the Union of the United States of America."], hereinafter referred to as Madison's Notes. (p. 116.) Governor Randolph's remedy consisted of fifteen resolutions to ameliorate the defects of the confederation, and Resolution No. 11 provided the initial framework for the guaranty clause. (Madison's Notes, p. 118.)

Resolution No. 11 came before the committee of the whole on June 5, 1787, and upon the motion of William Patterson, of New Jersey, was postponed because the members concluded the ques-

tion of representation in the legislative department of the proposed government needed to be resolved as a condition to its consideration. (Madison's Notes, p. 155.) Subsequently, on July 18, 1787, the guaranty clause resolution came before the committee of the whole and was discussed in detail. (Madison's Notes, pp. 406-408.) The resolution was amended and clarified by the discussion and was forwarded to the committee of detail which was preparing the initial draft of the proposed constitution.

On August 6, 1787, the committee of detail reported the drafted constitutional document to the Convention, and upon consideration of each provision as drafted, the Convention agreed to Article IV, Section 4, as amended, without debate. (Madison's Notes, p. 481, Sec. XVII, p. 499.) Madison's notes do not indicate when the guaranty clause was revised to its present form. It is sufficient to say, the guaranty clause was adopted in its present form, and has not been amended.

Concerning the question of separation of powers and its application to the republican form of government, primary evidence from the Federal Convention is meager. Discussions of the executive and judiciary being commingled and the effect of such a proposal resulted in the following discussion on July 17, 1787:

"MR. MADISON: If it be essential to the preservation of liberty that the Legisl: Execut: & Judiciary powers be separate, it is essential to a maintenance of the separation, that they should be independent of each other. The Executive could not be independent of the Legislure, if dependent on the pleasure of that branch for a reappointment. Why was it determined that the Judges should not hold their places by such a tenure? Because they might be tempted to cultivate the Legislature, by an undue complaisance, and thus render the Legislature the virtual expositor, as well the maker of the laws. In like manner a dependence of the Executive on the Legislature, would render it the Executor as well as the maker of laws; & then according to the observation of Montesquieu, tyrannical laws may be made that they may be executed in a tyrannical manner . . ."

"Mr. MADISON, was not apprehensive of being thought to favor any step towards monarchy. The real object with him was to prevent its introduction . . . *The preservation of Republican Gov. therefore required some expendient for the purpose, but required evidently at the same time that in devising it, the genuine principles of that form should be kept in view.*" (Madison's Notes, pp. 397-399.) (Emphasis supplied.)

On July 21, 1787, Madison took occasion to reflect upon the constitutional theory of separation of powers:

". . . If a Constitutional discrimination of the departments on paper were a sufficient security to each against encroachments of the others, all further

provisions would indeed be superfluous. But experience had taught us a distrust of that security; and that it is necessary to introduce such a balance of powers and interests, as will guarantee the provisions on paper. Instead therefore of contenting ourselves with laying down the Theory in the Constitution that each department ought to be separate & distinct, it was proposed to add a defensive power to each which should maintain the Theory in practice. In so doing we did not blend [commingle] the departments together. We erected effectual barriers for keeping them separate . . ." (Madison's Notes, pp. 426-427.)

While there are general discussions wherein the republican form of government is alluded to, the apparent absence of any serious discussion of the elements of a republican form of government leads to but one conclusion—there existed no substantial disagreement between the Founding Fathers as to the republican concepts upon which the government was to be patterned. There was little or no debate concerning the language of Article IV, Section 4, and as in the case of the doctrine of separation of powers, the membership, having agreed on the theory of a republican form, centered its attention and paramount concern to drafting a document which would clearly insure republican principles, not only in theory, but more importantly, in practice.

The people of the states, however, were not so well versed in political theory that they understood the nature of the new government and its expressed guarantee to each state of a republican form of government. Thus, the writings of James Madison, John Jay, and Alexander Hamilton in The Federalist, explaining the provisions of the proposed constitution, including the guaranty clause and its relationship by implication to the doctrine of separation of powers became essential.

There are two general discussions of the republican form in *The Federalists*. Madison, in *Federalist No.* 10, distinguishes a *republic* from a *monarchy*. (p. 109.) Likewise, in *Federalist No.* 39, Madison expounds upon the conformity of the new constitutional plan to generally recognizable republican principles:

"If we resort, for a criterion, to the different principles on which different forms of government are established, we may define a republic to be, or at least may bestow that name on, a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their offices during pleasure, for a limited period, or during good behaviour. It is *essential* to such a government, that it be derived from the great body of the society, not from an inconsiderable proportion, or a favoured class of it; otherwise a handful of tyrannical nobles, exercising their oppressions by a delegation of their powers, might aspire to the rank of republicans, and

claim for their government the honourable title of republic. *It is sufficient for such a government, that the persons administering it be appointed, either directly or indirectly, by the people; and that they hold their appointments by either of the tenures just specified; otherwise every government in the United States, as well as every other popular government that has been or can be well organized or well executed, would be degraded from the republican character* . . ." (p. 302.) (Emphasis supplied, in part.)

Subsequently, in *Federalist No. 43*, discussing the particulars of the proposed constitution, Madison outlined this explanation of the guaranty clause:

"In a confederacy founded on republican principles, and composed of republican members, the superintending government ought clearly to possess authority to defend the system against aristocratic or monarchial innovations. The more intimate the nature of such an union may be, the greater interest have the members in the political institutions of each other; and the greater right to insist, that the forms of government under which the compact was entered into, should be *substantially* maintained." (p. 341.)

\* \* \* \* \*

". . . But who can say, what experiments may be produced by the acprice of particular states, by the ambition of enterprising leaders, or by the intrigues and influence of foreign powers? . . . that if the general government should interpose by virtue of this constitutional authority, it will be of course bound to pursue the authority. *But the authority extends no farther than to a guaranty of a republican form of government, which supposes a pre-existing government of the form which is to be guaranteed. As long, therefore, as the existing republican forms are continued by the states, they are guaranteed by the federal constitution. Whenever the states may chose to substitute other republican forms, they have a right to do so, and to claim the federal guaranty for the latter. The only restriction imposed on them is, that they shall not exchange republican for anti-republican constitutions; a restriction which, it is presumed, will hardly be considered as a grievance.*" (p. 342.) (Emphasis supplied.)

One of the Principal challenges to the new government as proposed by the Constitutional Convention was that the new constitution itself was violative of the doctrine of separation of powers, hence, it was argued by the factions opposing adoption of the new government that the proposed constitution did not provide sufficient safeguards to insure individual liberty and freedom to the citizens of the several states.

In *Federalist No. 47*, Madison discusses the doctrine of separation of powers and recognizes Montesquieu as the political authority on the subject:

"One of the principal objections inculcated by the more respectable adversaries to the constitution, is its supposed violation of the political maxim, that

the legislative, executive, and judiciary departments, ought to be separate and distinct. In the structure of the federal government, no regard, it is said, seems to have been paid to this essential precaution in favour of liberty. The several departments of power are distributed and blended in such a manner, as at once to destroy all symmetry and beauty of form; and to expose some of the essential parts of the edifice to the danger of being crushed by the disproportionate weight of other parts.

"No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty, than that on which the objection is founded. The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny. Were the federal constitution, therefore, really chargeable with this accumulation of power, or with a mixture of powers, having a dangerous tendency to such an accumulation, no further arguments would be necessary to inspire a universal reprobation of the system. I persuade myself, however, that it will be made apparent to every one, that the charge cannot be supported, and that the maxim on which it relies has been totally misconceived and misapplied . . .

"*The oracle who is always consulted and cited on this subject, is the celebrated Montesquieu. If he be not the author of this invaluable precept in the science of politics, he has the merit at least of displaying and recommending it most effectually to the attention of mankind . . .*" (pp. 373, 374.) (Emphasis supplied.)

Montesquieu discusses the doctrine of separation of powers in The Spirit of Law (7, Thatcher Editor, The Ideas that Have influenced Civilization, p. 35) and looking to that treatise as instrumental to the inquiry at bar, he concludes separation of powers to be the cornerstone to free republican government:

"When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner.

"Again, there is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator. Were it joined to the executive power, the judge might behave with violence and oppression.

"There would be an end of every thing, were the same man, or the same body, whether of the nobles or of the people, to exercise those three powers, that of enacting laws, that of executing the public resolutions, and of trying the causes of individuals." (p. 37.)

Returning to the analysis of the proposed constitution and Madison's rebuttal of the oppositions' argument that the new government violated the doctrine of separation of powers, the argument was laid to rest in *Federalist No. 47:*

"From these facts, by which Montesquieu was guided, it may clearly be inferred, that in saying, 'there can be no liberty, where the legislative and executive powers are united in the same person, or body of magistrates;' or, *'if the power of judging, be not separated from the legislative and executive powers,'* he did not mean that these departments ought to have no partial agency in, or no control over the acts of each other. His meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that where the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution are subverted. This would have been the case in the constitution examined by him, if the king, who is the sole executive magistrate, had possessed also the complete legislative power, or the supreme administration of justice; or if the entire legislative body had possessed the supreme judiciary, or the supreme executive authority. This, however, is not among the vices of that constitution. The magistrate, in whom the whole executive power resides, cannot of himself make a law, though he can put a negative on every law; nor administer justice in person, though he has the appointment of those who do administer it. The judges can exercise no executive prerogative, though they are shoots from the executive stock; nor any legislative function, though they may be advised with by the legislative councils. The entire legislature can perform no judiciary act; though by the joint act of two of its branches, the judges may be removed from their offices; and though one of its branches is possessed of the judicial power in the last resort. The entire legislature again can exercise no executive prerogative, though one of its branches constitutes the supreme executive magistracy; and another, on the impeachment of a third, can try and condemn all the subordinate officers in the executive department.

"*The reason on which Montesquieu grounds his maxim, are a further demonstration of his meaning.* 'When the legislative and executive powers are united in the same person or body,' says he, 'there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws, to *execute* them in a tyrannical manner.' Again, '*Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator. Were it joined to the executive power, the judge might behave with all the violence of an oppressor.*' Some of these reasons are more fully explained in other passages; but briefly stated as they are here, they sufficiently establish the meaning which we have put on this celebrated maxim of this celebrated author.

"*If we look into the constitutions of the several states, we find, that notwithstanding the emphatical, and, in some instances, the unqualified terms in which this axiom has been laid down, there is not a single instance in which the several departments of power have been kept absolutely separate and distinct . . .*" (pp. 375, 376.) (Emphasis supplied, in part.)

Madison then proceeded to outline specific instances of the expressed or implied blending of the three departments of government as established by the constitutions of the several states, indicating, in each instance, the state constitution did not keep the

departments of government absolutely separate and distinct. He concluded:

"In citing these cases in which the legislative, executive, and judiciary departments, have not been kept totally separate and distinct, I wish not to be regarded as an advocate for the particular organizations of the several state governments. *I am fully aware, that among the many excellent principles which they exemplify, they carry strong marks of the haste, and still stronger of the inexperience, under which they were framed. It is but too obvious, that in some instances, the fundamental principle under consideration, has been violated by too great a mixture, and even an actual consolidation of the different powers; and that in no instance has a competent provision been made for maintaining in practice the separation delineated on paper. What I have wished to evince is, that the charge brought against the proposed constitution, of violating a sacred maxim of free government, is warranted neither by the real meaning annexed to that maxim by its author, nor by the sense in which it has hitherto been understood in America.* . . ." (pp. 380, 381.) (Emphasis supplied.)

As indicated in the foregoing analysis of the debates of the federal convention, it was no accident that discussions of the republican form of government and of the expressed guaranty to the states were perfunctory in character. However, the Federalist Papers are replete with reference to separation of powers as a fundamental concept of a free government. In fact, one of the attacks made upon the proposed constitution as drafted by the federal convention was that it violated the doctrine of separation of powers which was considered intrinsic to a free republican government. The concept of a republican form of government and by implication the doctrine of separation of powers were the underlying assumption upon which the framework of the new government was developed. In reaching this conclusion, this court holds that the doctrine of separation of powers is an inherent and integral element of the republican form of government, and separation of powers, as an element of the republican form of government, is expressly guaranteed to the states by Article IV, Section 4 of the Constitution of the United States.

Having concluded the guaranty clause question to be justiciable, and having ruled that separation of powers is inherent in the republican form of government, we turn now to the appellants' contention that (1) Article 1, Section 6 vests legislative power in the governor, and (2) it is void as being in conflict with Article IV, Secstion 4 of the Constitution of the United States, guaranteeing to every state a republican form of government.

Does Section 6 vest legislative power in the governor? We think

it does. Section 6 is self-executing, and, simply stated, it authorizes executive initiation of reorganization orders to abolish, transfer, or revise the whole or any part of existing executive agencies or functions effective July 1, subject to legislative veto within the time prescribed. The procedure is an innovation which is based upon the theory that reorganization of the executive department is first and foremost a responsibility of the governor, which should be sustained on a continuing basis. Thus, the plan reverses the usual legislative procedure in which legislative enactments are subject to executive veto. The clear intent is to facilitate executive reorganization desired by the chief executive. (Eley, *The executive Reorganization Plan: A Survey of State Experience,* Institute of Governmental Studies, University of California, Berkeley [1967]; Council of State Governments.)

While the amendment authorizes the governor to initiate reorganization orders directed toward abolition or consolidating all or certain executive agencies, changing their organization or their functional assignments, it also places important substantive limitations upon the chief executive. No reorganization proposal can attempt to change the legislative or the judicial branches, or any of their functions, and no plan can seek to alter the constitutionally delegated functions of state officers and state boards. Likewise, reorganization orders cannot deprive the Legislature of its constitutional authority to organize or reorganize the executive branch and assign functions to it on terms of its own choosing. More important, no reorganization proposed under any order can have the effect of adding to executive functions, extending agencies or functions beyond their scheduled expiration date, requiring additional revenues or appropriations, or changing the substance of state-local relationships, which limitations are sometimes provided explicitly and are always present by inference.

All reorganization orders issued by the governor shall be transmitted to both houses of the Legislature on the same day and within the first 30 calendar days of any regular legislative session. Each order shall be accompanied by the governor's message specifying with respect to each abolition of a function, the statutory authority for its exercise, and such order shall provide for the transfer or other disposition of records, property, and personnel affected by the order. In addition, the order shall provide for all necessary transfers of unexpended balances of appropriations of agencies affected by such order, and such changes in responsibility for

handling of special funds as may be necessary to accomplish the purpose of such order. Transferred balances of appropriations may be used only for the purposes for which the appropriations were originally made.

Executive reorganization orders transmitted to the Legislature shall take effect and have the force of general law on July 1, following transmittal, unless within 60 calendar days and before adjournment of the session, either house of the Legislature shall veto the same by resolution disapproving such reorganization orders by a majority vote of its members. Reorganization orders which are effective shall be published with the acts of the Legislature and the statutes of the state. Any executive reorganization order which is effective, or is to become effective, may be amended or repealed by the Legislature as statutes of the state are amended or repealed.

The power vested in the governor by Article 1, Section 6 is, in the nature of things, a legislative power, with a limited scope of exercise. The action of the governor in initiating and transmitting a reorganization order to both houses of the Legislature and their consideration of the same has characteristics similar to the Legislature enacting a law and transmitting it to the governor for his approval or veto. The transmittal of a reorganization order to both houses does not necessarily result in the order becoming a law. However, by the lapse of time, coupled with inaction on the part of either house, or the Legislature's adjournment during the 60-day period, the order becomes a general law. (Article 1, Section 6 [c].) Under that procedure, the Legislature and the governor exercise coordinate functions in enacting laws and the governor is an essential part of the legislation. (*Harris v. Shanahan,* supra.) Thus, the enactment of a reorganization order into a general law is made to depend first upon the act of the governor in transmitting the order to both houses of the Legislature. If within the time specified and before adjournment of the session either house vetoes the order, it is void and ineffective, similar to the veto by the governor of a bill enacted by the Legislature which comes to an end unless the Legislature overrides the veto. However, there is no provision made for overriding a veto of a reorganization order which has been submitted. Be that as it may, by lapse of time, coupled with inaction on the part of either house of the Legislature, the order becomes a general law to be published with the acts of the Legislature and the statutes of the state.

We are of the opinion that Section 6 of the amendment to Article

1 is not void as being in conflict with Article IV, Section 4, of the Constitution of the United States, guaranteeing to every state a republican form of government. The purpose of this provision of the Constitution is to protect the people of the several states against aristocratic and monarchal innovations, and against insurrections and domestic violence, and to prevent them from abolishing a republican form of government. (Cooley, Constitutional Limitations [7th Ed.], p. 45.) But it does not forbid them from amending or changing their Constitution in any way they may see fit, so long as none of these results is accomplished. (*Federalist No.* 43.) How power shall be distributed by a state Constitution among its governmental departments is commonly, if not always, a question for the state itself. There is nothing in the distribution here attempted by Article 1, Section 6, which supplies the basis for an exception. The constitutional amendment at issue is not a denial of a republican form of government. (*Highland Farms Dairy v. Agnew,* 300 U. S. 608, 612, 81 L. Ed. 835, 57 S. Ct. 549.)

A republican form of government is a government administered by representatives chosen or appointed by the people or by their authority. (*Harris v. Shanahan,* supra.) Madison says it is a "government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their offices during pleasure, for a limited period, or during good behavior." (*Federalist No.* 39.) In discussing the purport of the guaranty clause (Article IV, Section 4) he said: ".  .  . But the authority extends no further than a *guaranty* of a republican form of government, which supposes a preexisting government of the form which is to be guaranteed. As long, therefore, as the existing republican forms are continued by the states, they are guaranteed by the federal constitution. Whenever the states may choose to substitute other republican forms, they have a right to do so, and to claim the federal guarantee for the latter. The only restriction imposed upon them is, that they shall not exchange republican for anti-republican constitutions;  .  .  ." (*Federalist No.* 43.)

Section 6 authorizing the governor to issue reorganization orders did not abolish or destroy the republican form of government of Kansas, or substitute another in its place. The representative character of the government still remains. The people have simply vested in the executive a limited share of legislative power to make law, subject to legislative veto, but they have not overthrown the

republican form of government of this state. (*State, ex rel., v. Storey,* 144 Kan. 311, 58 P. 2d 1051.) However, and as hereafter noted, subject to the "Home Rule" amendment (Article 12, Section 5), the residuum of legislative power is still vested in the legislative branch pursuant to Article 2, Section 1. This was brought about by the people in amending the Constitution, which is the organic law of the land, is paramount over the governor, Legislature, and courts, and receives its force from the expressed will of the people. All this does not violate the republican form of government, nor does it produce anti-republican precepts, since as Madison says, it is only where "the whole power of one department is exercised by the same hands which possesses the whole power of another department, [that] the fundamental principles of a free Constitution are subverted." (*Federalist Nos.* 43, 47.) The Kansas government is still divided into the legislative, executive and judicial departments, the duties of which are discharged by representatives selected by the people at free elections held on regularly recurring election days.

It is true that pursuant to the amendment, the governor may exercise a power which is referred to in the distribution of governmental powers, as legislative power, and may in effect repeal or negate laws theretofore enacted by the Legislature and approved by the governor, and transfer records, personnel and unexpended balances of appropriations; but the legislative and executive departments are not destroyed, nor are their powers or authority materially curtailed. The veto power of the governor is not abridged in any way, and the Legislature still has power to reorganize the executive department as it may see fit, subject to the governor's veto, and it exercises all the legisative power of the state, not otherwise vested by the people as previously indicated.

The shifting of legislative power in a restricted sense is not new to this state. In 1961, the people transferred, in a limited sense, some of the legislative power to the municipalities pursuant to Article 12, Section 5 of the Kansas Constitution, commonly referred to as the "Home Rule." (*Capitol Cable, Inc. v. City of Topeka,* 209 Kan. 152, 495 P. 2d 885; *Claflin v. Walsh,* 212 Kan. 1, 509 P. 2d 1130. The Home Rule provisions, like Article 1, Section 6, are self-executing, and contain similar limitations upon the exercise of that power by the municipalities as are placed upon the executive in Section 6. Home Rule power is analogous to the executive's

authority "to make law," which likewise is a materially limited constitutional grant.

Before concluding, we feel compelled to answer the appellants' ancillary contention the provisions of Article 1, Section 6, amended by implication Sections 1, 15, 16, 19, 20, 24 and 25 of Article 2 of the Kansas Constitution relating to the vesting and exercise of legislative power, by empowering the governor to initiate and transmit executive reorganization orders in disregard of those procedural requirements of Article 2. We are of the opinion Section 6 effected no repeal by implication concerning the provisions of Article 2 relating to the enactment of legislation. As indicated, Section 6 is self-executing, providing a separate procedure by which executive reorganization orders may become effective. It is sufficient to say there exists no valid reason why separate and distinct methods of transmission and approval of those orders cannot be provided for in the Constitution, and we conclude there is no repeal by implication as to constitutional requirements of Article 2.

The judgment is affirmed.